Nott, J.,
delivered the opinion of the court:
The first and most important question in this case is as to the construction that should be given to the second clause of the specifications, which is in these words: “ The foundations and the brick walls now standing that were uninjured by the fire will remain and be carried up to the height designated on the plan by new work?.
*190 When it becomes the duty of a court to- ascertain the true construction which should be given to a disputed article of a contract, there are three things which ordinarily should be the subject of consideration: 1st, the circumstances, known to both parties, which preceded and attended the making of the contract in the light of which it should be interpreted; 2d, the general purpose of the contract and those specific provisions which directly or indirectly bear upon and affect the provision which is the subject of controversy; 3d, the language and effect of the clause or article to which a construction must be applied. We will consider these in their order.
The circumstances known to both parties which preceded and attended the making of this contract were these:
The old walls were in the possession and under the control of the defendants. It was to their interest that as much as possible of these old walls should be saved, yet that no imperfect portion should be retained. To a contractor it mattered not until he entered into a contract whether much or little should be utilized. If the former, there would be so much the less work for him to do; if the latter, he would be paid for doing so much the more; in either case, he could regulate his bid by the amount of old wall that was to enter into the new building. But it was vital to every contractor to know how much of the old walls woidd remain, and how much new work he must contribute. A superficial inspection would not tell the bidders what was the real condition of the walls. It was necessary that they be dismantled of the injured parts, if the contractors sending in proposals were to make close and accurate estimates ; otherwise every bidder would leave margin enough in his calculations to cover the unknown contingency, and the result might be that the government would- be allowed little or nothing for the old walls. Such being the conditions of the case, the officers of the government, instead of leaving the walls' as the fire left them, and turning them over to the contractor to be razeed by him to such extent as might be found necessary, pulled down what they deemed the imperfect portions, and apparently left only so much of them standing as was fit for the new superstructure. They next prepared the specifications afterward annexed to the contract, and then, handing the contractor a copy of these specifications on the one hand and show *191 ing him the razeed walls on the other, invited him to make proposals for erecting a superstructure.
These circumstances, so far as they go, point to an interpretation favorable to the claimant. “ The duty of the court is to ascertain not what the parties may have secretly intended as contradistinguished from what their words express, but what is the meaning of words they have used. It is merely a duty of interpretation, that is, to find out the true sense of the written words as the parties used them; and of construction, that is, when the true sense is ascertained, to subject the instrument in its operation to the established rules of law.” (1 Greenl. § 277, p. 323.) If the defendants had turned the old walls over to the contractor untouched at the time he entered into the contract, that would have been a significant, a controlling fact against him. If it was not their intention to save the uninj ured portion of the walls and reject the injured, why did they touch them ? If the contractor was to assume the risk of the old walls, what object had the defendants in apparently rejecting- and apparently retaining a portion before inviting his bid ? Somebody had to assume the risk of the old walls being fit to build upon. Responsibility for their fitness (in the absence of express words to the contrary) would naturally be assumed by the party who owned them, and controlled them, and put them into the contract, and who apparently had prepared them for the uses and purposes of the contract. It would be contrary to the ordinary dealings of men to infer, from such circumstances, that the party who did not own them or control them, who did not put them into the work as his contribution toward the new building, and who had not examined, tested, or prepared them for a new superstructure, was to assume and be responsible for their fitness.
• The other terms and provisions of the contract which have any bearing upon this point are not very significant, but, so far as they go, are likewise favorable to the claimant. In the first place, the contract, like the advertisement upon which it was founded, was not for rebuilding the edifice, but for “ repairs.” In the second place, the contract expressly throws “the risk and expense of all the materials and work” which the claimant was to “furnish” upon him, but does not in terms, if at all, throw upon him any risk as to the fitness of the walls furnished by the defendants. In the third place, the contract *192 also expressly provides uthat all the materials furnished and work performed ” by tbe claimant “should he of the best quality and subject to the inspection, approval, or rejection” of the defendant’s superintendent. The old walls were neither material furnished nor work performed by the claimant, and there was no provision expressly authorizing their rejection by the party who furnished them. In the fourth place, the contract is not like that in Dermott v. Jones (2 Wall., 1), where the contractor agreed to build a house and have it “ fit for use and occupation” by a certain day. Here the contractor simply agreed to repair a partially existing building under the supervision of the other party’s officers and according to the plans and specifications annexed. In other words, his responsibility for the fitness of the old walls does not, if it exist, spring out of the general purpose or express covenants of the contract, but must be attributed entirely to the single clause of the specifications which has been quoted.
That clause of the specifications was prepared by the defendants before the .contract was made, and was shown to the claimant when he was estimating for the work. Upon the faith of it he made his bid. Its language is, “ The foundations and the brick walls now standimg that were uninjured by the fire will remain and be carried up to the height designated on the plan by new work.” It is manifest that this language needs some amplification to make its meaning clear. The defendants contend ip effect that it means [“ So much of] the foundations and the brick walls now standing [as subsequent examination may show] were uninjured by the fire will remain and.be carried up.” The claimant contends that the true construction is, “ The foundations and the brick walls now standing [being those portions'] that were uninjured by the fire will remain.”
As was held by the Supreme Court in Garrison Case (7 Wall., 688; 7 C. Cls. R., 78), “doubtful expressions should be construed most strongly against the party who uses the language.” This expression of this contract is “ doubtful,” because its meaning cannot be rendered certain without the interpolation of words (one way or the other) which the party who used the language neglected to employ. The defendants first razeed the burnt walls1 to their own liking by throwing off the supposed injured parts; then prepared these specifications; then gave them to the claimant to estimate upon; then made them *193 a part of the contract without a word of amplification or a provision that should make their meaning clear and certain; and now seek to interpolate into them, in two distinct places, modifying words without which their ambiguous language does not bear the construction they give to it, and with which all responsibility concerning the matter in controversy will be shifted from themselves to a party who neither furnished the walls nor draughted the specifications.
For these doubtful acts and doubtful expressions the defendants are justly responsible. The old walls were their contribution toward the new building to save themselves the expense of so much new work; they were not put in for the benefit of the contractor; and it seems unreasonable to hold that he was to take the risk of the defendants’ material being fit for the purpose for which they intended it should be used. If the defendants withdrew this part of their material and made the contractor furnish other material of his own in its stead and do more work than he would otherwise have been required to do, the law will imply a contract on their part to pay for that which they ordered done.
For this reason it was not necessary that the contractor should object. If the defendants had ordered a change of the material which he had agreed to furnish, or in the work which he was bound to perform amid circumstances that might imply or warrant the belief that no additional expense would result from the change, it would have been his duty to notify them that he could not make the substitution for the contract-price. But if they had determined to abandon the old walls in toto, and to substitute entire new walls and entire new foundations, or if they had determined to withdraw the old lumber which they likewise had put into the contract as a portion of their contribution to the work, and directed new lumber to be substituted by the contractor, assuredly no notice would have been necessary on his part to tell them that the substitution must be at their cost and charge. The commanding officer of the naval station, Commodore Hitchcock, did not indeed order the entire walls to be obliterated, but he did order one-third of them to be removed. He was not the engineer in charge (termed by the contract “ the superintendent of the work”), who had power to reject the contractor’s materials; but he was the representative of the defendants, their highest responsible *194 officer on tlie ground, in constant communication with the Chief of the Bureau of Yards and Docks, and presumably acting with the knowledge and approval of the bureau, and he, acting for the defendants, withdrew one-third of this old-wall material from the contract, and directed the contractor to furnish new material in its stead. The defendants reaped the benefit of this substitution, and it would be highly inequitable and narrowly technical to defeat the contractor’s recompense were we to hold that he ought to have notified the officer that substituting new material for old would necessitate additional outlay by the defendants. What was palpable to the contractor was palpable to the officer. He who wanted the work done intended to pay for it. Qui sentit eomnodum, debet et sen-tire onu°. But it is not a case where mistake or misrepresentation can be set up, or where an option could have been exercised. If the change was not necessary, it would have been most iniquitous in Commodore Hitchcock to have ordered it at the contractor’s cost3 if, in his judgment, it was necessary, it had to be made, regardless of the question who was to pay for it.
It is proper to add that the representations made to the claimant’s agent, as set forth in finding III, at the time the walls were shown to him, we put entirely out of sight. If this were a suit to reform the contract, such evidence would be admissible 3 and it may be that if the civil engineer (who is designated in the specifications as the person who was to supervise and inspect the work) had authority to make such representations, they would be a part of the res gestee, admissible to show the thing contracted for; but as the authority of the officer is doubted, we prefer to exclude his representations in the consideration of the case.
2. The second question of importance in the case is whether its consideration upon the merits is barred by the statute of limitations.
The item of $4,050 for tearing down and replacing portions of the old wall was not, strictly speaking, extra work. The wall as finally constructed was neither longer nor higher nor of different material than the wall which the contract called for. The demand is properly to recover an extra expense thrown upon the contractor contrary to the true intent and requirements of the contract. Strictly, he sues not for work outside of the express agreement, but for the defendants’ breach of their *195 implied covenant that be should be allowed to use and utilize the old walls as they stood when he received them. His action for this work must needs be upon the specific contract, and he could not have brought an action upon it while it remained executory. The counsel for the defendants has insisted that if this was additional work it was rendered under an implied contract, and that the cause of action accrued and the statute began to run the moment the work was completed. But we are of the opinion that the cause of action sprang out of the specific contract, and that no action could have been maintained by the claimant while it remained executory, and that it so remained until the buildings were accepted by the defendants subsequent to the 7th December, 1866.
The item of $362.79 is of the same nature. The defendants furnished to the contractor a portion of the material necessary for packed beams and gave him his option to put them in or solid-tie beams, as he might elect. They were not at liberty, in the face of their agreement, to say that the material so furnished was not suitable, and compel the contracter to put in the other kind of beans. This was a hinderance and expense thrown upon the contracter contrary to the terms of the contract, but was in no sense extra work under a different or an implied agreement. Instead of being able to bring an action in assumpsit for these beams as for work not required by the contract, the claimant’s cause of action sprang out of the very terms of the contract.
The items for brown-stone capitals and for supporting foundation-walls, on the contrary, are clearly eases of extra work. They were not required by the contract; they were distinct things which the claimant had not agreed to construct or furnish ; and he might have gone on and completed all that he had agreed to do without them. They were furnished before the 7th December, 1866, and if the claimant could have maintained an action for them while the specific contract remained execu-tory, they are barred by the statute.
The contract contemplated “ changes and modifications.” It provided that “ no extra charge for modifications will he allowed unless agreed upon hy the parties, and no changes or modifications mutually agreed upo n by the parties to this contract shall in any way affect its validity.” It further provided that three specific installments of $12,000 each (of sums in gross and not percentages) should be paid to the contractor as the work progressed, *196 and. finally that the balance which might become due to him should not be paid until the work should be “ entirely completed” “to the satisfaction of the party of the second part.”
On the 7th December, I860, the work had not been entirely completed. If payment for extra work falls within the foregoing provision of the contract, the statute of limitations does not preclude a recovery.
As the Supreme Court said in Dermott v. Jones (2 Wall., 1), “While a special contract remains executory, the plaintiff must sue upon it.” “He must produce the contract upon the trial, and it will be applied as far as it can be traced; but if, by the fault of the defendant, the cost of the work or material has been increased, in so far the jury will be warranted in departing from the contract prices.” If the claimant had brought his action for any of these items of extra work immediately after performing it, the defendants might have answered that the contract was still executory; that it was to be applied so far as it could be traced; that no payments were to be made except the installments specified in the contract until the buildings should be completed.and accepted; that it cannot always be determined what are extras until the contract work be done; and that by the plain import of the contract the defendants were not to be thus harassed, and that such suits were premature.
It is not easy to understand how the provision that “no changes or modifications mutually agreed upon by the parties to this contract shall in any way affect its validity ” can have any other significance. Certainly changes or modifications mutually agreed upon would not per se affect the validity of an express agreement; certainly they would affect -the price, notwithstanding this clause, for it cannot be supposed that either party intended that extra work should be furnished without an additional consideration. The only rational’ interpretation of the clause is that those provisions of the contract which threw upon the defendants the obligation of paying three specific installments, and assured to them the privilege of having all other payments delayed and gathered up into one final payment when the entire work should be completed, was not to be impaired by demands for extras, but should remain valid, i. e., operative as to them as well as to the subject-matter proper of the express agreement.
3. As to the bill of extras dated October 18, 1866, reduced *197 by the naval board from $4,688.09 to $2,394.89, set forth in the sixth finding, we think the case comes under the decision of the Supreme Court in Child, Pratt & Pox Case (12 Wall., 232; 7 C. Cls. R., 209). There the claimants protested against the action of the Holt-Davis-Campbell commission; but they subsequently accepted the reduced amount allowed by the commission, and receipted therefor in full without protest. That, was precisely what the claimant here did, and Ms case cannot be distinguished from theirs.
The judgment of the court is that the claimant recover—
For the extra work upon the wall. $4, 050 00
For the entire expense in putting in solid beams.... 362 79
For the brown-stone capitals.. 621 48
Amounting in the aggregate to..... . 5, 034 27