PARK BROS. & CO., Limited, *v.* KELLY AXE MANUF'G CO.

*(Circuit Court of Appeals, Sixth Circuit. January 29, 1892.)*

**1. PLEADING—DEMURRER.**
   A demurrer to an answer denying plaintiff's power to make the contract sued upon does not admit the facts therein alleged, so as to make them part of the petition; and it is error for the court, on overruling the demurrer, to regard them as part of the petition, and dismiss the suit.

**2. LIMITED PARTNERSHIPS—CONTRACTS.**
   Although Act Pa. June 2, 1874, § 5, limits the liability of partnerships formed thereunder to $500 on a single undertaking, unless the same is in writing signed by two managers, yet a failure to so sign a contract for a larger amount will not prevent the partnership from suing thereon when it has made or tendered full performance.

**3. SAME—CONTRACT BY AGENT—RATIFICATION.**
   The allegation that the contract in suit was made by an agent for the benefit of plaintiff, a limited partnership, organized under Act Pa. June 2, 1874, and that it has since been adopted by the partnership, is sufficient to sustain the action; there being nothing in the statute to prevent such ratification.

**4. SAME.**
   The bringing of a suit by a limited partnership on a contract made by an agent is a ratification of its terms.

**5. CONFLICT OF LAWS—CONTRACTS—LIMITED PARTNERSHIPS.**
   The legality of the execution of a contract made in Kentucky by an agent for a limited partnership organized under the laws of Pennsylvania, in a suit brought in the former state, is to be determined by the laws of Kentucky, and not by the act under which the partnership was created.

In Error to the Circuit Court of the United States for the District of Kentucky.

Action by Park Bros. & Co., Limited, against Kelly Axe Manufacturing Company. Demurrer by defendant sustained. Plaintiff brings error. Reversed.

*Humphrey & Davie,* for plaintiff in error.

A. *Barnett* and *Walter Evans*, for defendant in error.

Before JACKSON, Circuit Judge, and SAGE and SWAN, District Judges.

JACKSON, Circuit Judge.   It appears from the record in this case that on December 9, 1887, the plaintiff in error submitted to the defendant in error, a Kentucky corporation, located and doing business at Louisville, in said state, the following written proposition:

"We propose to supply you with all the axe and hatchet steel, of good and suitable quality, you will use in your works prior to December 31, 1888, not to exceed 125 net tons, nor be less than 100 net tons, at 8½ cents per pound. The above price is guarantied against our own and association decline on the undelivered portion of this contract at the date of said decline.   Terms: Four-months note, or 3 per cent. discount for cash in 30 days from date of shipment.   Deliveries to be made f. o. b. Pittsburgh, less freight to Louisville, Ky.   To be specified for as follows, at the rate of 10 tons per month.   In the event of serious fire, strikes, or delays, unavoidable or beyond our control, the provisions of this contract shall cease until such cause shall have been removed.   In case any shipment of steel proves unsuitable, it is understood that you will immediately discontinue its use, and advise you (us) of the facts, that we may have the opportunity of deciding what shall be done under the circumstances, so that possible loss and damage to either you or ourselves shall be prevented."

This proposition was signed, "PARK BROTHERS & Co., (Limited.) JOHN A. SUTTON," and was dated at Louisville, Ky., where it was submitted to and accepted in writing by the Kelly Axe Manufacturing Company.   Thereafter, plaintiff proceeded with the delivery of the steel, and when 80,097 pounds thereof had been received, the defendant declined and refused to accept the balance, amounting to 119,903 pounds, which plaintiff alleges was duly tendered.   Partial payments were made by defendant on 80,097 pounds received, leaving a balance due thereon of $1,756.54 according to the contract price, which defendant refused to pay.   The plaintiff thereupon instituted this suit in July, 1889, against the defendant, to recover the sum of $5,120.32, with interest thereon from January 1, 1889, as the damages sustained by its alleged breaches of said contract.   The first count of the original petition or declaration claims the sum of $3,363.78 as the net profit the plaintiff would have made upon the 119,903 pounds of steel which was tendered to and refused by defendant; said net profit being the alleged differences between the cost of producing that quality of steel, with the freight thereon to Louisville, Ky., from Pittsburgh, and the contract price of 8½ cents per pound to be paid therefor.   The second count of the petition seeks to recover the unpaid balance of $1,756.54 on the 80,097 pounds received and accepted.   In the petition or declaration the plaintiff avers that it is and was at all times a corporation established and existing by and under authority of the law of the state of Pennsylvania, with power and rights, under the laws of said state, to contract and be contracted with, to sell and be sold; that since its creation it has had and still has its office and place of business at Pittsburgh, in said state of Pennsylvania, of which it is a citizen.   The defendant is alleged to be a corporation and citizen of Kentucky.

The defendant demurred to this petition, setting up as grounds of demurrer—*First*, that the sum claimed in either or both paragraphs (or counts) of the petition was not sufficient in amount to bring the subject-matter within the jurisdiction of the court; *second*, that said petition, and neither paragraph thereof, states facts sufficient to constitute any cause of action as against defendant. This demurrer was properly overruled and disallowed by the court, for the reason that the petition claimed more than $2,000 for the alleged breach of the contract, and because, if the two counts could be regarded as presenting two distinct causes of action, they could properly be joined in one suit under the Kentucky Code, so as to make the "matter in dispute" sufficient to give the court jurisdiction. The theory of the demurrant was that the measure of damage set up in the first paragraph of the petition for non-acceptance of the 119,903 pounds of steel tendered, was stated in a way that would only entitle plaintiff to nominal damages, which, added to the $1,756.54 claimed by the second paragraph, would be less than the $2,000 requisite to confer jurisdiction. This was clearly an erroneous view to take of the petition, which claimed against defendant the sum of $5,120.32 for the breaches complained of, and the court below was right in overruling the demurrer.

Thereafter the plaintiff, by leave of the court, amended the first paragraph of its petition, and alleged, in substance, that defendant's refusal to accept the 119,903 pounds tendered it under the contract was not because of any alleged unsuitableness of said steel; that, by reason of said refusal, plaintiff had been compelled to and had disposed of said 119,-903 pounds of steel at the best market price procurable for the same, which was 5¾ cents per pound; and that after allowing defendant credit for the sum thus realized, and the further credit of $233.31 as the freight on said quantity of steel to Louisville, Ky., and charging it with the contract price of 8½ cents per pound on the same, the difference amounted to $3,064.02, which, with interest since December 31, 1888, constituted plaintiff's damage for the non-acceptance by defendant of the 119,903 pounds of steel. To the petition as thus amended the defendant interposed several defenses. By the first paragraph of its answer, it denied plaintiff's corporate existence. By the second, after admitting the written agreement sued on, and its acceptance thereof, it denied that plaintiff had prepared or offered to it axe and hatchet steel in quantities of 10 tons per month, or any quantity, during the period covered by said agreement, of good and suitable quality, needed in its work; that plaintiff had tendered the 119,903 pounds of steel free on board the cars at Pittsburgh, or any part of it, good or suitable for use in its factory; that it had refused any tender of such steel; that the cost of manufacturing such steel was 5 cents per pound; that there was any profit to plaintiff in making such steel, as claimed; that its refusal to accept the steel was not caused by its unsuitableness; that plaintiff had the right, under said contract, to deliver within the year ending December 31, 1888, the 119,-903 pounds of steel, or any part thereof, or to receive 8½ cents per pound therefor; that plaintiff was, by its refusal or failure to accept said steel,

compelled to dispose of the same; that the market price thereof, after its alleged refusal to accept, was 5¾ cents per pound; that the steel was disposed of at that price; and that the sum claimed by plaintiff was due from it. By the third paragraph the defendant set up as a special defense that the plaintiff and the other makers of steel throughout the United States had about and before December, 1887, entered into a trust combination to raise the price of said steel from 6 cents per pound, which was a reasonable price, and afforded a reasonable profit to the steel-makers, to 8½ cents per pound; that defendant having a large axe and hatchet factory, in which much money was invested and numerous operatives were employed, was forced to sign said contract with plaintiff in order to procure the supply of steel needed to carry on its works; that 8½ cents per pound was more than the steel was worth, and was an unreasonable price therefor, extorted from defendant under said trust combination; and that it was not, therefore, bound by said contract to pay said price, but was only liable for the actual value of the steel delivered to it, which was of no value. By the fourth paragraph, it was alleged that the use of the 80,097 pounds of steel delivered to and received by defendant had resulted in or caused a loss and damage to its business, occasioned by the trade rejecting and refusing to handle its axes and hatchets because of the inferior quality of said steel employed in making the same, etc.; and for this damage a counter-claim of $10,000 was set up. By the fifth paragraph of its answer the defendant averred that plaintiff was a joint-stock association, known as a partnership, (limited,) organized under an act of Pennsylvania passed June 2, 1874, with power to sue and be sued in the firm name of Park Bros., Limited; that plaintiff and defendant attempted to make the contract sued on, but that the same was and is from the first null and void; that plaintiff, under said act of June 2, 1874, had no power to make any contract, for the non-performance of which it could be subjected to a liability in excess of $500, unless such contract was reduced to writing, and signed by at least two managers of said association; that the written contract declared on was not signed by any manager or managers of said association, and that said John A. Sutton, who claimed to be the agent of said association, in fact had no authority to bind it; and that, as said contract subjected plaintiff to a liability in excess of $500, it was null and void, and defendant was not bound thereby. To these special defenses, constituting the 3d, 4th, and 5th paragraphs of the answer, the plaintiff demurred on the grounds that they, nor either of them, presented any defense or cause of action. The court did not act upon the demurrer so far as it related to the defense setting up the trust combination between plaintiff and other steel-makers, but sustained it as to the counter-claim and overruled it as to the defense setting up the invalidity of the contract under the Pennsylvania act of June 2, 1874; and thereupon the court adjudged and decreed "that said demurrer be now carried back to the petition, and the court adjudges that said petition is insufficient in law, and the demurrer is sustained thereto;" to which plaintiff excepted; and, under leave given, plaintiff thereafter filed an amended

petition, setting forth that although said John A. Sutton executed the written contract sued on in his own individual name, and was bound. thereon individually, he made the same as agent for and for the benefit of plaintiff, and that "plaintiff has adopted and does adopt said contract as its own," etc. The defendant demurred to the plaintiff's petition as thus amended because insufficient in law to sustain its action. The court sustained this demurrer, and thereupon ordered the dismissal of the plaintiff's suit, from which judgment the plaintiff prosecutes the present writ of error, and assigns for error in the action of the court below—*First*, that the court erred in overruling its demurrer to the fifth paragraph of the defendant's answer, which set up the invalidity of the contract under the Pennsylvania act of June 2, 1874, for want of signature by two managers of the association; *second*, that the court erred in its order carrying back the demurrer of the plaintiff to the petition, and adjudging the said petition to be insufficient in law, and sustaining the demurrer thereto; *third*, that the court erred in sustaining the defendant's demurrer to the petition as amended, and holding the same as insufficient in law; and, *fourth*, that the court erred in its final judgment, entered July 9, 1891, dismissing the petition.

It does not appear from the record that the plaintiff was given or allowed the right of replying to said fifth paragraph of the answer upon the demurrer thereto being overruled by the court, nor that its right to make reply thereto was waived or abandoned. On the contrary, it is shown by the record that upon overruling that demurrer of plaintiff the court proceeded to carry the same back to the petition, and adjudge that it was insufficient in law, notwithstanding a direct demurrer thereto by defendant had been previously overruled. It is undoubtedly a well-settled rule that a demurrer reaches back to the first error in the pleadings, and judgment may properly be given against the party who committed it. In *Cooke* v. *Graham*, 3 Cranch, 229–235, Chief Justice MARSHALL thus states the rule:

"When the whole pleadings are thus spread upon the record by a demurrer, it is the duty of the court to examine the whole, and go to the first error. When the special demurrer is by the plaintiff, his own pleadings are to be scrutinized, and the court will notice what would have been bad upon a general demurrer."

The principle has no application, however, where the defect is one of form and not of substance. *Aurora City* v. *West*, 7 Wall. 82, and *Railroad Co.* v. *Harris*, 12 Wall. 84. In the present case the original. petition, as first amended on the measure of damages, was not bad upon general demurrer. It states a good and valid cause of action against the defendant, whose demurrer thereto had been properly overruled. Upon what principle, then, could plaintiff's demurrer to the fifth paragraph of the answer operate to read into the petition the facts and averments set up in the fifth paragraph of the answer, on overruling plaintiff's demurrer to that paragraph, and thus make the petition bad? There is no rule of pleading warranting such a procedure as that. Plaintiff's demurrer to said fifth paragraph, while admitting the facts therein alleged

for the purpose of testing their legal sufficiency as a defense to the suit, did not so admit them as to make them a part of the averments of the petition, or authorize the court to incorporate them into said petition, and thereby create defects therein which did not otherwise exist on the face of the pleading itself. We are accordingly clearly of the opinion that the second assignment of error is well taken, and should be sustained. The other assignments of error are so connected as to be properly considered together.

The action of the court in overruling plaintiff's demurrer to the fifth paragraph of the answer, and in sustaining defendant's demurrer to the petition as thereafter amended, proceeded upon the theory that the written contract between plaintiff and defendant, which formed the cause of action sued upon, was invalid or wanting in binding force as to the plaintiff because not signed by two of its managers, and that being invalid, and not obligatory upon the plaintiff, there was no mutual and reciprocal obligation such as the law required to make the contract binding upon the defendant. This conclusion was rested upon the provision of section 5 of the Pennsylvania act of June 2, 1874, relating to and providing for the organization of limited partnerships, which provided:

"That there shall be at least one meeting of the members of the association in each year, at which there shall be elected not less than three nor more than five managers of said association, one of whom shall be the chairman, one the treasurer, and one secretary, or one may be both treasurer and secretary, who shall hold their respective offices for one year, and until their successors are duly installed; and no debt shall be contracted or liability incurred for said association except by one or more of said managers, and no liability for an amount exceeding five hundred dollars, except against the person incurring it, shall bind the said association, unless reduced to writing, and signed by at least two managers."

In *Melting Co.* v. *Reese*, 118 Pa. St. 355, 12 Atl. Rep. 362, and *Walker* v. *Brewing Co.*, 131 Pa. St. 546, 20 Atl. Rep. 309, the supreme court of Pennsylvania had this section before it for construction in suits against limited partnerships organized under the act upon verbal contracts made by one manager, which the partnership company had repudiated. Thus, in *Melting Co.* v. *Reese*, 118 Pa. St. 355, 12 Atl. Rep. 362, the chairman of the limited partnership verbally contracted to sell 600 tierces of oleomargarine oil at $6\frac{1}{2}$ cents, when the market price was $8\frac{1}{2}$ cents. The company refused to confirm the sale and deliver the oil. The purchaser tendered the price, and brought suit to enforce the contract. The supreme court held that the manifest purpose of the section was "to protect the association and its members from all obligations not sanctioned in the manner especially provided;" that under the enactment the individual members did not have the authority of general partners to bind the association or limited partnership; that strangers dealing with such limited partnership, being supposed to know the law, are bound by the limitation imposed upon the members, and could not have the benefit of those inferences which flow from a relation of general partnership merely, and that "a contract of sale made by the chairman of the board of managers of such association without express authority from the board, or author-

ity to be implied from a course of like sales made without objection, is not binding." *Walker* v. *Brewing Co.*, 131 Pa. St. 546, 20 Atl. Rep. 309, is to the same effect. In *Andrews Bros. Co.* v. *Youngstown Coke Co.*, 39 Fed. Rep. 353, a bill was filed to reform an improvident contract made by one manager, and which the company had disavowed and repudiated, by compelling its execution by two managers of the association, to the end that it might be legally enforceable against the defendant. The relief sought was denied by the circuit court; ACHESON, J., holding that said section was in the nature of a statute of frauds, of which the association could avail itself, and could not be deprived of the right so to do by a court of equity. These decisions fall far short of holding that all verbal or written contracts of limited partnerships, involving a liability exceeding the sum of $500, are null and void unless made and signed by two managers of the association. They do not so construe said section 5 of the act, which, being intended for the protection of such association and their members, admits of no such construction. The intimation, if not the direct ruling, in *Melting Co.* v. *Reese*, 118 Pa. St. 355, 12 Atl. Rep. 362, is that a single member of a limited partnership, under express authority from the board of managers, or authority to be implied from a course of like sales made without objection, might bind the association. It will be noticed that the contracts sought to be enforced against the associations in the above cases were Pennsylvania contracts; that they were never approved, ratified, or acted upon by the association, but were promptly disaffirmed and repudiated. The court below, while conceding that said section of the act of 1874 did not make the contract in question null and void, yet held that the fifth paragraph of the answer, which set it up as a defense to the whole petition, was a good defense to the plaintiff's recovery of damages for breach of the executory contract of sale and purchase, for the reason that said contract could not have been enforced against the plaintiff if it had chosen to insist upon the informality in the written contract. From the construction given the act by the supreme court of Pennsylvania, the court considered it followed necessarily "that executory contracts of any kind cannot be enforced against either party, where, as in this case, there is no other consideration than the mutual agreement of the parties thereto." We do not concur in this view and ruling as a correct application of the law to the present case. The legal principle that contracts must be mutual does not mean that each party must be entitled to the same remedy for a breach by the other. There must be mutuality of obligation, but not necessarily mutuality of remedy. *Brown* v. *Munger*, (Minn.) 44 N. W. Rep. 519. This question arose in *Fishmongers' Co.* v. *Robertson*, 5 Man. & G. 131, where it was contended that as the plaintiffs were a body corporate, and the agreement which they sought to enforce was not under seal, as required by law, it did not bind them, and could not be obligatory on the defendant. TINDAL, C. J., said, in delivering the judgment of the court, that the argument for the defense was that the company could not sue as plaintiffs on an agreement which could not have been enforced against them as defendants. The court held the de-

fenses bad, inasmuch as the declaration contained an averment of the performance of every matter which was a condition precedent to the right of action. As the result of this and other like decisions cited, it is said in Hare on Contracts (page 380) that "what is essential to a recovery is not that the contract shall be mutually obligatory, but that the plaintiff shall have complied with the terms on which the defendant declared his willingness to be bound." Contracts covered by the statute of frauds furnish analogous illustrations of their principle. Thus a contract for the sale of merchandise is obligatory on the vendor, under the seventeenth section of that statute, although the vendee does not sign the same, and could not be compelled to pay the price; and so, conversely, the vendee cannot defend an action for the purchase money on the ground that the vendor did not sign the memorandum, and might have withheld the goods. A defendant who has received **or** been tendered the full benefit of a contract cannot be allowed, in reason or justice, to set up as a defense to an action upon such contract that the plaintiff was not originally, or at the time of its execution, bound to perform the same. This principle is clearly recognized in *Storm* v. *U. S.*, 94 U. S. 76, where it was held that a defendant who had received the consideration of a written agreement could not, in an action brought against him for a breach of his covenant or contract, set up that the agreement did not bind the plaintiff to perform his covenants, provided it appears that he has performed them in good faith, and without prejudice to the defendant. In that case the defendants attempted to show that the agreement between themselves and the United States was inoperative because it contained a provision that it might be terminated at such time as the quarter-master general might direct, and in consequence of the further provision that it was made subject to the approval of the department and division commander. There was no direct evidence that said commander had approved the contract. The court say:

"Beyond doubt the written agreement went into operation, and it is not even suggested that department and division commanders ever expressed any disapproval of its terms and condition. * * * Suppose it be true that the quartermaster general might terminate it, if he should see fit. It is a sufficient answer to the suggestion to say that he never did interfere in the matter, and that the contract continued in full force and operation throughout the whole period for which the necessary supplies were purchased by the United States in open market—"

And then proceed to lay down the rule that, where defendant has received the consideration of a written agreement, it is no answer to an action for a breach on his part to say that it did not bind the plaintiff when executed; citing Add. Cont. (6th Ed.) 15, and *Morton* v. *Burn*, 7 Adol. & E. 25.

Now, in the present case, it is distinctly shown by the petition, and not controverted by the answer, that the written agreement between the parties was not only made, but went into actual operation; that plaintiff delivered 80,097 of the 200,000 pounds of steel agreed to be furnished and received; that defendant paid the contract price therefor, less

the sum of $1,756.54; that the balance; of the steel was duly tendered by plaintiff and refused by defendant. What is the legal effect of those averments, if true? They establish full performance of the contract on the part of plaintiff, under the rule laid down in *Hepburn* v. *Auld*, 1 Cranch, 321–330, where it is said by the chief justice, speaking for the court, that—

"To entitle themselves to the money for which the suit was instituted, it is incumbent on the plaintiffs to show that they have performed the very act on the performance of which the money became payable, or that they are excused by the conduct of the defendant for its non-performance. The act itself has not been performed, but a tender and refusal is equal to a performance."

This is fully supported by the modern authorities; and, after such actual and legal performance as plaintiff has alleged in this case, it is no answer to the action for defendant's alleged breach of the contract to say that plaintiff was not bound to have performed or tendered such performance.

Again, if it be conceded that plaintiff was not originally bound by the written agreement sued on, it is alleged in the last amendment of the petition that plaintiff had adopted and did adopt said contract. There was nothing in the agreement, either as to subject-matter or terms and conditions, to render the contract illegal or contrary to public policy, or to show that it was beyond the scope and authority of the plaintiff to make, or, if made by an unauthorized agent, to prevent the plaintiff from ratifying and adopting it; nor would such ratification and adoption have to be made in the form or with the formality of a writing signed by two managers of the partnership company, (limited.) In section 635, 2 Mor. Priv. Corp., the rule is accurately stated as follows:

"It is to be observed that a provision in a charter requiring a certain formality in the formation of a contract does not necessarily make such formality essential to the ratification of a contract already formed, and the superior agents of a corporation may have authority to dispense with formalities which are made obligatory upon inferior or subordinate agents." Citing *Beecher* v. *Rolling-Mill Co.*, 45 Mich. 103, 109, 7 N. W. Rep. 695, and *Reuter* v. *Telegraph Co.*, 6 El. & Bl. 341.

In the latter case the charter of the defendant corporation prohibited the company from being bound by any contracts above a certain value, unless they were signed by at least three directors. The company was sued on a contract above the prescribed value, which had been made by the chairman alone, verbally; and it was held that the contract, executed by the chairman alone, without authority, had been rendered binding upon the company by the subsequent acquiescence on its part. *Wilson* v. *Railroad Co.*, 2 De Gex, J. & S. 475, is to the same effect. The decisions of the supreme court establish beyond question the same general principle. *Supervisors* v. *Schenck*, 5 Wall. 782; *Bank* v. *Matthews*, 98 U. S. 629; *Creswell* v. *Lanahan*, 101 U. S. 349–351; *Pittsburgh, C. & St. L. Ry. Co.* v. *Keokuk & H. Bridge Co.*, 131 U. S. 381, 9 Sup. Ct. Rep. 770. So in *Kelsey* v. *Bank*, 69 Pa. St. 426–429, the court said:

"The law is well settled that a principal who neglects promptly to disavow an act of his agent, by which the latter has transcended his authority,

makes the act his own; and the maxim which makes ratification equivalent to precedent authority is as much predicable of ratification by a corporation as it is of ratification by any other principal, and it is equally to be presumed from the absence of dissent."

It admits of no question that plaintiff, in its corporate or limited partnership capacity, had the power, as a company or association, to make the contract in question. There is nothing in the act of June 2, 1874, set up in the fifth paragraph of the answer, to limit and confine the plaintiff, whether regarded as a corporation or association, to the single mode of entering into contracts by two of its managers; and, whatever contract it could make as a body, it can ratify when made by an agent who has acted without previous authority. There is, indeed, nothing in the pleadings in the present case to negative the presumption that Sutton, who acted on behalf of plaintiff, did not have full and ample authority to make the contract sued on for plaintiff. The statement in the fifth paragraph of the answer that he did so without proper authority is a legal conclusion not admitted by the demurrer to said paragraph. But, however this may be, plaintiff's ratification and adoption of the contract is sufficiently alleged to enable it to sue upon the same.

Besides, the bringing of suit upon the contract is a ratification thereof, and of the act of the agent in entering into it for plaintiff. *Bank* v. *Sharp*, 4 Smedes & M. 75. In *Fishmongers' Co.* v. *Robertson*, 5 Man. & G. 131, the court seems to have considered that the ratification implied in bringing suit thereon rendered the contract obligatory on the company. See, also, to the same point, *Richards* v. *Green*, 23 N. J. Eq. 537, and Fry, Spec. Perf. (2d Amer. Ed.) § 297. It is not, however, deemed necessary to discuss what acts or contracts on the part of the principal will constitute a ratification of an unauthorized act done by another in his name or on his behalf. It being distinctly alleged that plaintiff had adopted, and had, in legal effect, performed, the contract, the right to maintain the action thereon was clear.

But, aside from the views already expressed, there is presented by the record another ground for holding the action of the lower court to be erroneous. It seems to have been assumed by the court, and the same assumption is made by counsel for defendant in this court, that the written contract between plaintiff and defendant, which constituted the foundation of the suit, was a Pennsylvania contract, governed and controlled by the said act of June 2, 1874. The contract was dated and executed at Louisville, Ky., by or on behalf of both parties. The alleged defect in the agreement is that it was not signed or executed by or for plaintiff in proper form, or according to the formalities required by the fifth section of the Pennsylvania act of June 2, 1874, in order to make it binding on plaintiff. It is settled by the authorities that the place of making the contract governs as to the formalities necessary to the validity of the contract. Wheat. Confl. Laws, § 401; Pars. Bills & Notes, 317. In *Scudder* v. *Bank*, 91 U. S. 412, the court say:

"Whether a contract shall be in writing, or may be made by parol, is a formality to be determined by the law of the place where it is made. If valid

there, the contract is binding, although the law of the place of performance may require the contract to be in writing." Citing *Dacosta* v. *Davis*, 24 N. J. Law, 319.

It is further said by the court that—

"Matters bearing upon the execution, the interpretation, and the validity of a contract are determined by the law of the place where the contract is made. Matters connected with its performance are regulated by the law prevailing at the place of performance. Matters respecting the remedy, such as the bringing of suits, admissibility of evidence, statutes of limitation, depend upon the law of the place where the suit is brought."

In *Pritchard* v. *Norton*, 106 U. S. 130, 1 Sup. Ct. Rep. 102, the foregoing propositions are again approved. See, also, *Matthews* v. *Murchison*, 17 Fed. Rep. 768. ' It follows from the foregoing principles and authorities that, the contract in question having been executed at Louisville, Ky., its validity and binding operation is not to be determined by the Pennsylvania act of June 2, 1874, set up as a defense by the fifth paragraph of the answer, and plaintiff's demurrer thereto should have been sustained.

Other questions presented need not be specially referred to, as the foregoing conclusions dispose of the case. We think the plaintiff's assignments of error are well taken, and that the action of the lower court in overruling plaintiff's demurrer, and in sustaining defendant's demurrer to the petition as amended, and in dismissing the suit, was erroneous, and should be reversed. It is accordingly so ordered and adjudged, and the cause will be remanded to the circuit court for the district of Kentucky for further proceedings therein in conformity with this opinion, and with leave to plaintiff to further amend its petition so as to show the citizenship of its members, if it is an association or limited partnership and not a corporation, as may be necessary under the authority of *Chapman* v. *Barney*, 129 U. S. 682, 9 Sup. Ct. Rep. 426.