## MANIGAULT v. S. M. WARD & CO. et al.

(Circuit Court, D. South Carolina. June 22, 1903.)

1. JURISDICTION OF FEDERAL COURTS—FEDERAL QUESTION—SUFFICIENCY OF ALLEGATIONS.

A Circuit Court has jurisdiction of a suit on the ground that it arises under the Constitution of the United States, where it appears from the allegations of the bill that the claim is made in good faith that an act of the Legislature under which defendants are proceeding to do the acts sought to be enjoined is in violation of the federal Constitution, although other grounds of invalidity are also alleged, and where it is further alleged that complainant will sustain damages, direct and consequential, by reason of the threatened action, in excess of $2,000.

2. NAVIGABLE WATERS OF UNITED STATES—STREAMS—PUBLIC HIGHWAY.

To render a stream wholly within a state a navigable water of the United States, it must not only connect with some other waterway by means of which interstate or foreign commerce may be carried on, but

---

¶ 1. Jurisdiction of United States courts in cases involving federal question, see notes to Bailey v. Mosher, 11 C. C. A. 308, and Montana Ore Purchasing Co. v. Boston & M. Consol. Copper & Silver Min. Co., 35 C. C. A. 7.

must be a public highway having another terminus or landing, which is or may be used by the public.

**3. NAVIGABLE WATERS OF STATE—LAWS OF SOUTH CAROLINA.**

Such a stream, which has no public terminus except at its outlet, is not a public highway under the Constitution and statutes of South Carolina.

**4. WATER COURSES—RIGHT OF NAVIGATION—RIPARIAN OWNERS.**

The ownership of a plantation on a stream opposite the mouth of a creek gives no right in the navigation of the creek as a riparian proprietor thereon.

**5. STATUTES—VALIDITY—MANNER OF PASSAGE.**

Under the Constitution of South Carolina one Legislature possesses no power to bind a succeeding one by prescribing prerequisite conditions to the entertaining or passage of bills, and a court cannot declare an act which is duly authenticated invalid because such conditions prescribed by an act of a preceding Legislature were not observed.

**6. SAME—SPECIAL LAWS.**

A legislative act authorizing the building of a dam across a creek in continuation of an embankment constructed to prevent the flooding of adjacent rice fields by reason of freshets and tides in a river is based on peculiar and exceptional conditions, and is not in violation of the provision of the Constitution of South Carolina prohibiting the enactment of special laws when a general law can be made applicable.

**7. STATES—POWERS—AUTHORIZING DAM ACROSS STREAM.**

The Legislature of a state has power to authorize the construction of a dam across a nonnavigable stream.

**8. CONTRACTS—VALIDITY—DURESS.**

A contract under seal, by which persons who had constructed a dam across a stream without legislative authority, to protect their crops from floods, agreed to the removal of the same in consideration of its being allowed to remain until the end of the season, cannot be held to have been without consideration, or made under duress, where the other parties who claimed the dam to be unlawful made no threats except to institute legal proceedings.

**9. CONSTITUTIONAL LAW—STATUTE—IMPAIRING OBLIGATIONS OF CONTRACT.**

A legislative act passed in the legitimate exercise of the police powers of the state is not unconstitutional, as impairing the obligation of contracts, because it contravenes the provisions of a private contract between individuals.

**10. CONTRACTS—CONSTRUCTION AND EFFECT.**

A valid contract, by which persons who had built a dam across a stream without legislative authority agreed to its removal, does not preclude them from afterwards seeking legislative authority to construct another dam, nor from constructing it after such authority has been obtained.

In Equity. On motion for preliminary injunction.

Mitchell & Smith, for complainant.

Theodore G. Barker, for defendants.

SIMONTON, Circuit Judge. On 3d March, 1903, the General Assembly of South Carolina passed an act to authorize the construction of a dam across Kinloch creek, in Georgetown county. 24 St. at Large, p. 246. The preamble of the act recites the necessity of constructing a dam across Kinloch creek in order to drain certain lowlands in the county of Georgetown subject to overflow by reason of high tides and freshets in Santee river; that the construction of the

¶ 8. See Contracts, vol. 11, Cent. Dig. § 437.

said dam is the only feasible means of draining said lands; that the lands bordering on said stream are nearly entirely owned or controlled by A. A. Springs and St. J. M. Lachicotte, copartners in business as S. M. Ward & Co.; that it is their purpose to construct a good and sufficient floodgate in said dam. Now, in order to remove any doubt as to the authority of the said S. M. Ward & Co. to erect, construct, and maintain said dam, the right, power, and privilege is given to the said Springs and Lachicotte, copartners as S. M. Ward & Co., their heirs and assigns, and the survivors of them or either of them, to construct, erect, and maintain a dam across Kinloch creek "provided that the said A. A. Springs and St. J. M. Lachicotte, doing business under the firm name of S. M. Ward & Company, shall be liable for all damages as may be established in any court of competent jurisdiction by any landowner claiming that his land has been damaged by reason of the erection of said dam." This act having been passed and approved, the complainant, Arthur M. Manigault, filed his bill of complaint in this court against Springs and Lachicotte, seeking an injunction against them restraining the exercise by them of the right, power, or privilege given them in this act. After alleging that the bill is within the pecuniary jurisdiction of this court, the matter in controversy exceeding the value of $2,000 exclusive of interest and costs, the bill states: That the complainant is the owner of a valuable rice plantation situate on North Santee river, bordering partly on Minim creek, and lying in part just opposite the mouth or entrance of Kinloch creek; and that he is also the owner in fee of a valuable mill site situate on Santee river on the waters of Bluff Back creek, a branch of Kinloch creek. That Kinloch creek is a navigable stream and water highway capable of navigation by vessels therefrom into Santee river, thence to the ocean, and to all parts of the United States or the world. Not only so, but it connects at one point with the main state highway leading from the upper part of the upper portion of the state down Santee river, and that there is a public landing at the point at which Kinloch creek is connected with the said state highway, so making a continuous highway from the same over the navigable waters of Kinloch creek to the main state road, and so to the upper country. That in August, 1898, complainant was the owner of the valuable lands above spoken of, lying opposite to the mouth of Kinloch creek, and F. W. Ford was the owner of certain rice lands in the upper end of Kinloch creek. That at that time the defendants had already erected a dam across Kinloch creek, an obstruction to the navigation thereof, and that Ford and himself, conceiving themselves injured thereby both in the planting of their lands and the use of the creek, desired the obstruction to be immediately removed, and gave notice thereof to the defendants. Long negotiations followed, the result of which was an agreement under seal between Lachicotte and Springs on the one part and complainant and Ford on the other, whereby, in consideration that complainant and Ford would consent that the dam remain until the 31st of December, 1898, complainant and Ford could remove the obstruction, and Kinloch creek would thereafter be kept open and free and clear from all or any part of such obstructions without let or hindrance, objec-

tion, or molestation whatsoever in act or procurance by Lachicotte and Springs, their agents, servants, or employés. That, relying on this agreement, complainant purchased the mill site on Santee river, which could be used for a ricemill or sawmill, the chief element of the value of which was its water connection by means of canal through Bluff Back creek with Kinloch creek, and the consequent necessity for keeping Kinloch creek open and unobstructed. So the erection or retention of the dam across Kinloch creek will injure complainant both by the interruption of the use of Kinloch creek and Bluff Back creek, and by preventing access to the public landing on the state road from his plantation on Kinloch creek, and also by obstructing the inflow of the tide from Santee river through Minim creek, which otherwise would have access into Kinloch creek, and so causing the water from Santee river to flow back upon the banks to the plantation opposite the mouth of Kinloch creek, thus compelling him to strengthen and raise his banks. The bill then avers that the act of the state of South Carolina above recited authorizes the defendants to construct a dam across Kinloch creek, and so act in direct contravention of their contract under seal, and that it also enables them to close a public highway for their own private purposes; that the said act of the state of South Carolina violates article 1, § 10, of the Constitution of the United States, inasmuch as it impairs the obligation of a contract; that it also violates article 1, § 28, of the Constitution of the state of South Carolina, and section 1, art. 14, of the same Constitution, which declares all navigable waters shall forever remain public highways free to all citizens and inhabitants; that it violates section 1, art. 14, of the Constitution of the United States, in that it deprives him of his property without due process of law; that the closing of Kinloch creek is the taking of private property for private use, without consent of the owner, and without compensation, in violation of section 17, art. 1, of the Constitution of South Carolina, and also in violation of section 10, art. 1, and section 1, art. 14, of the Constitution of the United States; that said act is a local and special law altering a highway in contravention of section 34, art. 3, of the Constitution of South Carolina, forbidding the General Assembly to enact special or local laws on certain subjects, among them to lay out, open, alter, or work roads or highways; that the act of the General Assembly aforesaid grants a privilege or immunity, and is for a private purpose, and so was passed in contravention of section 31, art. 3, c. 2, of the Code of Laws of South Carolina of 1902, which declares that no bill of this character shall be introduced or entertained in either House except by petition signed by the parties seeking the privilege or immunity for the private purpose, which petition shall set forth fully and distinctly the merits and particulars of the case, and, if the same in any wise affects the rights of others who reside in this state, the petition must be accompanied by proof that such parties have had 60 days' notice of the presentation of said petition, and that notice of intention to present such petition be advertised once a week for at least 3 weeks in a newspaper carrying the largest circulation in the county where the privilege or immunity is to be enjoined, the first notice to be at least 60 days before the

presentation of the petition; but that in fact no petition for this purpose was ever presented, and no notice thereof ever given or published, as required by law. The bill then charges that the defendants are about to proceed under said act of assembly, and prays an injunction.

The case has been heard upon a motion for an injunction. For this purpose have been used the verified bill and numerous affidavits on behalf of the complainant and of the defendants. Kinloch creek is a stream in the lowlands near the coast of South Carolina. Rising from very small beginnings a short distance from the coast, it flows in an easterly direction, receiving Bluff Back creek as a tributary, and empties into Minim creek, which, after its junction with Kinloch creek, empties into the North Santee river. The dam formerly erected by the defendants, and which, under the agreement with complainant and F. W. Ford, had been removed, was constructed on Kinloch creek below its junction with Bluff Back creek. Both ends of this dam were on lands of the defendants. The floodgate had been placed on the southerly end of the dam, and a trunk at the other end of the dam, both the floodgate and trunk being on lands of the defendants. Presumably it is the intention of the defendants, in the exercise of the privilege granted by the Legislature, to build another dam near, if not upon, the location of the former dam.

The first question which arises in this case—as, indeed, in all cases in federal courts—is as to the jurisdiction of the court. The action is between citizens of the same state. The only ground of jurisdiction is that the case involves questions arising under the construction or application of the Constitution of the United States. Cohens v. Virginia, 6 Wheat. 264, 5 L. Ed. 257. For the federal question we must examine the allegations of the bill alone. The federal question must appear upon its face. Tennessee v. Union & P. Bank, 152 U. S. 454, 14 Sup. Ct. 654, 38 L. Ed. 511. The bill sets up violations of the Constitution of the United States, and also violations of the Constitution of South Carolina. Unless the federal question thus set up appears to be specious (Illinois Central v. Chicago, 176 U. S. 656, 20 Sup. Ct. 509, 44 L. Ed. 622), the court must take jurisdiction. The fact that a question made in good faith is presented to the court for its decision gives it jurisdiction of the case. Illinois Central v. Adams, 180 U. S. 28, 21 Sup. Ct. 251, 45 L. Ed. 410. And, there being a federal question in the case, the court can go on and decide every other question, whether federal or not. The ultimate question upon which the case may turn, whether of federal, local, or general law, is a matter which in no wise affects the jurisdiction of the case. Mayor v. Cooper, 6 Wall. 247, 18 L. Ed. 851; Tennessee v. Davis, 100 U. S. 257, 25 L. Ed. 648; St. Paul, etc., Ry. Co. v. St. Paul & N. P. R. Co., 68 Fed. 10, 15 C. C. A. 167. The bill states that the amount in controversy is over $2,000. It alleges consequential as well as direct damages. It is the claim set up by the complainant which fixes the jurisdiction of the court (Pine v. The Mayor [C. C.] 103 Fed. 338); not a claim evidently fictitious, and alleged simply to create jurisdiction, but a claim made in good faith upon grounds however fallacious or untenable (Schunk v. Mo-

line Milburn & Stoddart Co., 147 U. S. 505, 13 Sup. Ct. 416, 37 L. Ed. 255). It is a question to be determined by evidence, and to be decided by the court, and this gives jurisdiction. Railway v. Adams, 180 U. S., 21 Sup. Ct., 45 L. Ed., supra. See, also, Interstate B. & L. Ass'n v. Edgefield Hotel Co. (C. C.) 109 Fed. 692; Scott v. Donald, 165 U. S. 58, 17 Sup. Ct. 265, 41 L. Ed. 632. In this lies the distinction between those cases in which a bare inspection of the record discloses a want of jurisdictional amount. Vance v. Vandercook, No. 2, 170 U. S. 468, 18 Sup. Ct. 645, 42 L. Ed. 1111, is a case of this character. That was an action of claim and delivery under the Code, an action the substitute of and equivalent of the old action of trover. The plaintiff claimed exemplary damages in his complaint, and sought in this way to sustain the jurisdiction. But the record disclosed that the goods were of the value of $1,000. The law of South Carolina in actions of this character did not allow exemplary damages, and only such damages as necessarily flowed from the conversion, measured either by interest or by the increase in the value of the goods converted. It thus appearing by the inspection of the record that the damages could not equal $2,000, the court had no jurisdiction.

### As to the Merits.

The contention of the complainant is that the authority given to the defendants to construct a dam across Kinloch creek cannot be exercised: First. Because Kinloch creek is a navigable stream, and so a public highway, whose use by the citizens of the state is secured forever by section 1, art. 14, of the Constitution of South Carolina, declaring that all navigable streams within the limits of the state shall be common highways, and forever free as well to the inhabitants of the state as to the citizens of the United States, without any taxes or impost therefor, unless the same be expressly provided for by the General Assembly. Second. Because, whether it be a public highway or not, its use is secured him as a riparian proprietor on the said creek. Third. Because he is the owner of a valuable mill site on Santee river, which is connected by a canal with Bluff Back creek, a tributary of Kinloch creek. The deprivation of this right to use Kinloch creek, occasioned by the act in question, takes away his property for a private purpose without compensation. Fourth. That the act in question is invalid, because none of the conditions for its consideration and introduction by the General Assembly prescribed in section 31, art. 3, of the Civil Code of South Carolina, have been complied with. Fifth. Apart from and irrespective of these considerations, the defendants are under contract with him not to obstruct this stream, and the act in question impairs the obligation of that contract.

The first question which comes up on consideration of the merits of this motion is: Is Kinloch creek a navigable stream, either as a navigable water of the United States or navigable under the laws of South Carolina? The distinction between these classes is seen in The Montello, 11 Wall. 411, 20 L. Ed. 191:

"It—that is, a stream—can only be deemed navigable water of the United States when it forms itself, or by its connection with other waters, a con-

tinued highway over which commerce is or may be carried on through other states or foreign countries in the customary mode in which such commerce is conducted by water. If, however, the stream is not of itself a highway for commerce of other states or foreign countries, or does not form such highway by its connection with other waters, and is only navigable between different places within the state, then it is not a navigable water of the United States, but only a navigable water of the state."

In order to make a stream navigable by the public, it is not enough that it is floatable—that is, capable of floating vessels or other craft. It must be a public highway. To be a public highway, it must have a terminus, a quo the public can enter it, and a terminus ad quem they can leave it. Young v. Culbertson, 1 MacQ. H. L. Cases, 455. In State v. Duncan, 1 McCord, 404, the defendant was indicted for obstructing a bold creek making in from Ashley river within the limits of the city of Charleston. It was not disputed that Ashley river was a public highway, but it was not shown that it ended at or had on it a public terminus. This was held essential to convict the defendant for obstructing a highway. See Chisholm v. Caines (C. C.) 67 Fed. 287, for a discussion of this question and the authorities there quoted sustaining this position. The Montello, above quoted, states the same doctrine. Does Kinloch creek answer this definition?

As has been seen, it empties into Minim creek, which last creek flows into the Santee river, a public highway. This gives one terminus to the public. The complainant contends that there is on Kinloch creek, or tributary thereto, another terminus through a canal leading to a landing on a public highway or road which runs into the upper part of the state. In 1816 (8 St. at Large, p. 277) the General Assembly of South Carolina granted a charter to the Winyah & Wando Canal Company. This charter authorized the construction of a canal from Santee river to Winyah Bay through such place as may seem to the company most convenient. The act required the corporation to commence and prosecute the proposed canal within two years, and to complete it within seven years. The conditions of the charter were not fulfilled, and so the franchise was forfeited. In 1831 (8 St. at Large, p. 370) this charter was revived. The act reviving the charter provided that the charter would be forfeited in case the reviving company did not commence work on the canal within three years, and complete that part of the canal between Winyah Bay and Santee river within six years, from the passage of the act. On a map of Georgetown county, of date ——, in Mills' Atlas, a canal is represented running from Winyah Bay to Kinloch creek. Its entrance into Kinloch creek is above the location of the proposed dam. There is no other evidence that this is the canal spoken of in the act. There is no evidence that it has ever been completed. There is a canal dug from Kinloch creek at a point above this location of the dam in question. It runs between lands of the defendants and of Mrs. F. W. Ford, and finally is lost in the woods. It is used for the drainage of these lands. There is a public road crossing this canal by a bridge a short distance from Kinloch creek connecting the lands on the Santee with the up-country of South Carolina. The great preponderance of the evidence is that at this bridge there is no public landing, and that no landing at this bridge was ever used by the

public. On the contrary, it appears that the riparian proprietors on each side of this canal denied any public right in it. Among these proprietors was F. W. Ford, who forbade the use of the end of the bridge on his land by any one, and this with the knowledge and consent—perhaps under the direction—of the complainant. There is no other landing on this canal connecting with any public highway. Assuming, therefore, that this canal now at this place was a part of the canal projected in 1816, and again provided for in 1831, it would appear that on the forfeiture of the charter its use and control fell into private hands, and, if the project was for a public canal, that project has failed. Kinloch creek, beyond this canal, loses itself in the land. So there is no terminus ad quem for the public after entering it from the Santee, and it certainly is not a navigable water of the United States. Is it a highway under the law of South Carolina? In section 1335, Civ. Code S. C., it is declared that all streams which have been rendered or can hereafter be rendered capable of being navigable by rafts or lumber or timber by the removal of accidental obstructions and all navigable water courses and cuts are hereby declared navigable streams, and such streams shall be common highways and forever free as well as to the inhabitants of this state as to the citizens of the United States, without any taxes, etc., as in the language of the Constitution above quoted. This act does not change the definition of what are navigable waters. It only emphasizes the law already declared that navigability does not depend upon the depth or width of a stream, nor upon the ebb and flow of the tide therein. It makes no new law; it declares the law.

Even although Kinloch creek may not be a navigable water of the United States, nor a navigable public stream, and so a public highway under the laws of South Carolina, still riparian proprietors have a right to use the same for their own private purposes, carrying their products to market and bringing supplies to their lands. Neither the bill nor any of the affidavits discloses the fact whether there are any riparian proprietors on Kinloch creek proper above the dam other than these defendants. The act of the Legislature in question says that the defendants own almost entirely all these lands, and, if there be any other riparian proprietors than they, the act reserves to such proprietors, if any there be, the right to bring an action for any injury the dam may occasion them. The complainant claims to be a riparian proprietor on two grounds: First, because his plantation on Minim creek is directly opposite to the entrance of Kinloch creek into Minim creek; second, because he owns a valuable mill site on Santee river, which is connected by a canal with Bluff Back creek, through which the product of the mill can be carried through Kinloch creek, and thence to market. The fact that the plantation of complainant is opposite the mouth of Kinloch creek can give him no claim as riparian proprietor to use the navigation of that part of the creek above the dam. He has no lands above the dam on that creek between which and this plantation there would be intercourse.

It is said that by reason of the dam the water which came in from the Santee on tides and freshets would not find a free escape into Kinloch creek, and would be pressed back on the plantation on Minim

creek, thus requiring increase of height and strength of the banks. This is the theory. There are not enough facts developed in the affidavits which can enable the court to come to any satisfactory conclusion on this point.

With regard to the mill site on Santee river, the defendants deny the title of complainant in this mill site, and, at the least, insist that he is estopped by his deed conveying to them the Newlands plantation, which is adjacent to this mill site. This deed of conveyance gave but one boundary of the Newlands plantation on the south, and that boundary is Santee river. This is said to estop the complainant from asserting that the small mill site is not included in that boundary. On this important question of title it is not advisable at this stage of the case to determine it by the very unsatisfactory mode of proof furnished by affidavits. But admitting, for the present, title in the mill site in complainant, has he established the connection of this mill site by way of canal with Bluff Back creek? This parcel of land called a mill site was once known as the "Tilton Mills." It was the site of a ricemill put up by a firm of which Tilton, Pringle, the Horrys, and Trapier were partners. The enterprise proved disastrous, and the property was sold to pay the debts of the copartnership. It was conveyed to F. L. Frost in November, 1872. This deed does not mention Bluff Back creek, nor any canal connecting the mill site with that creek, nor any canal at all. On the 4th October, 1901, F. L. Frost conveyed this property to the complainant, and in his deed there is no mention of Bluff Back creek, or of a connecting canal, or of any canal. There is mention of rights of way over the Bluff and Newlands plantation. But it can hardly be said that these words convey the right to dig a canal or to use a canal, in the absence of all evidence that any canal actually existed. We are discussing matters in existence in 1872. Surely, if any canal had ever been there, or had ever been contemplated, some one witness, at least, could be found who could testify to this fact. On the other hand, we have the affidavits of Ford, Ward, Sparkman, and Doar—men formerly acquainted with the Bluff and Newlands plantation—who swear that within their knowledge, extending over a period long anterior to the acquisition of the title by complainant, no canal in fact existed there, and none, so far as they knew, was contemplated. It does not appear that complainant has shown himself a riparian proprietor on Kinloch creek, or on its tributary, Bluff Back creek.

The complainant also contends that the act in question is invalid because none of the pre-existing conditions for its consideration by the General Assembly by sections 31 and 34, art. 3, of the Civil Code of South Carolina, had been fulfilled. Section 31 provides that no bill for the granting of any privilege or immunity, or for any private purpose whatever, shall be introduced or entertained in either House of the General Assembly, except by petition signed by the parties seeking the privilege, accompanied by a draft of a bill or joint resolution to carry out the purpose of the petition. Section 34 provides that the petition shall set forth fully and distinctly the merits and particulars of the case, and, if it affects the rights of others, with proof that they, so far as known, have had 60 days' notice of the presentation of

the petition before it is presented, and that notice of the intention to make the application shall be published in one newspaper of the county where the privilege is to be enjoyed once a week for at least 3 weeks, the first publication to be at least 60 days before said petition is presented. It is alleged, and not denied, that not one of these conditions have been complied with. Can this inquiry be entered into? Does this invalidate the act? We must bear in mind that the presumption is always in favor of the validity of an act (Ogden v. Saunders, 12 Wheat. 294, 6 L. Ed. 606), and that the court cannot inquire into the motive of the Legislature (Dodge v. Woolsey, 18 How. 371, 15 L. Ed. 401). The act bears the great seal of the state, is certified to by the presiding officers of both Houses, and is approved by the Governor. Can we go behind these, and question the regularity of the legislative action. The question came up in Field v. Clark, 143 U. S. 649, 12 Sup. Ct. 495, 36 L. Ed. 294. It is there held that:

"The signing by the speaker of the House, and by the president of the Senate, in open session, of an enrolled bill, is an official attestation by the two Houses of Congress that such bill is one that has passed Congress. * * * And when a bill, thus attested, receives the approval of the President, and is deposited in the public archives, its authentication as a bill that has passed Congress should be deemed complete and unimpeachable."

And, commenting upon the question whether the journals of either House can be used to impeach a bill, the court says:

"The evils that may result from the recognition of the principle that an enrolled act in the custody of the Secretary of State, attested by the signatures of the presiding officers of the two Houses of Congress, and the approval of the President, is conclusive evidence that it was passed by Congress, according to the forms of the Constitution, would be far less than those that would certainly result from a rule making the validity of congressional enactments depend upon the manner in which the journals of the respective Houses are kept by the subordinate officers charged with the duty of keeping them."

That case quotes the decisions of almost every state in the Union, showing a great diversity of opinion among them. As this is a matter within the control of the state, we must follow the decisions of the supreme court of South Carolina. They uniformly hold that, when the Constitution provides a special mode for the passage of an act, that mode must be observed, and that recourse can be had to the journals of the two Houses in order to discover if that mode has been followed. State v. Platt, 2 S. C. 150, 16 Am. Rep. 647; State v. Smalls, 11 S. C. 262; Bond Debt Cases, 12 S. C. 200; State v. Hagood, 13 S. C. 46. Although these cases rest upon constitutional requirements, still they proceed upon the doctrine that the courts can look behind the great seal, and examine the journals of the two Houses. In the case at bar there was no constitutional requirement which has been violated. The provisions of an act of a preceding Legislature have not been followed in the matter of notice required by the act. Does this make this act invalid? The legislative power in South Carolina is vested in the General Assembly. The Constitution fixes the power of the General Assembly. Each General Assembly possesses all these powers, and is subject to no limitation not found in the Constitution. One Legislature, therefore, cannot curtail or enlarge the power of any succeeding Legislature, unless, indeed, within

its constitutional powers a Legislature has entered into a contract with a third party. Such a contract is protected under the Constitution of the United States. When, therefore, one General Assembly passes an act like this in question, declaring that no bill shall be introduced or entertained in either House of the General Assembly unless certain prerequisite conditions are fulfilled—conditions not existing in the Constitution—it assumes a power which it does not possess. If, notwithstanding, any succeeding General Assembly shall receive and entertain a bill which has not fulfilled these conditions, this action on its part is either a declaration of its independence of these restrictions, or it is a repeal of the previous act pro tanto. "Acts of Parliament," says Blackstone (1 Bl. Comm. 90), "derogating to the power of subsequent Parliaments, bind not." See, on this subject, Cooley on Constitutional Limitations (4th Ed.) p. 152 (*126), note 3.

Another objection to this act is that it is a local and special law, and in conflict with section 34, art. 3, of the Constitution of the state. This section forbids local or special laws in 10 particulars not applying to this case, and adds: "In all other cases when a general law can be made applicable no special law shall be enacted." The evils which this act we are now considering sought to remedy are peculiar and exceptional. As far as the case discloses, Kinloch creek runs through lands suitable for rice culture, and for that only. Consequently they are very low, easily flooded, subject to overflow by any abnormal tide or freshet. It is in close connection with Santee river. In that river, when any high tide is met by the descending stream, especially during a freshet, the water comes up into Kinloch creek, and submerges all the circumjacent fields. Thus the crops sown there are constantly liable to overflow and destruction. To prevent this, a freshet bank had been constructed on the adjacent plantations, one end resting on Santee river and passing over the lands of the defendants, which was intended to meet and counteract this influx of water. To make this freshet bank continuous and effectual, it must cross Kinloch creek. No general law could meet the evil, because the conditions are exceptional. The act in question does not infringe this constitutional requirement.

With regard to the right of the Legislature to authorize the construction of this dam there seems but little question. As we have seen, Kinloch creek is not a navigable water of the United States, nor is it a navigable stream in the sense of a public highway. The right of the Legislature to authorize a dam in such a stream is shown in Gilman v. Philadelphia, 3 Wall. 713, 18 L. Ed. 96. This case cites and follows Willson v. Black Bird Creek Marsh Co., 2 Pet. 245, 7 L. Ed. 412. In that case the Legislature of Delaware had authorized the construction of a dam across Black Bird creek. This was one of those creeks passing through a deep, level marsh adjoining the Delaware, up which the tide flows for some distance. The value of the property on its banks must be enhanced by excluding the water from the marsh, and the health of the inhabitants probably improved. Measures calculated to produce this object, provided they do not come in collision with the powers of the general government, are undoubtedly within those reserved to the states. But the measure authorized

by this act stops a navigable stream, and must be supposed to abridge the rights of those who have been accustomed to use it. This abridgment, however, unless it comes in conflict with the Constitution or a law of the United States, is an affair between the government of Delaware and its citizens, of which this court can take no cognizance. Chief Justice Marshall, who delivered the opinion of the court, then shows that the act of Delaware was not in conflict with the Constitution or any law of the United States. See, also, Pound v. Turck, 95 U. S. 459, 24 L. Ed. 525; Gould on Waters, § 35, note 2; Lake Shore, etc., v. Ohio, 173 U. S. 292, 19 Sup. Ct. 565, 43 L. Ed. 702.

But this may be all correct, still does the act in question impair the obligation of a contract? In 1898 the complainant and F. W. Ford—Ford at that time being a proprietor of the plantation above this dam—feeling themselves injured by a dam which the defendants had constructed across Kinloch creek, desired its removal. They claimed that the existence of the dam was unlawful; that they had the right to require Kinloch creek to be kept open, and to remove the trunk, floodgate, and bank of the dam as obstacles to navigation, and for the free ingress and egress of the water in the creek. The defendants insisted upon their right to maintain the dam, and objected to its removal. The matter was placed in the hands of counsel representing each party, instructed to protect their interest. After considerable negotiations and correspondence, articles of agreement under seal were finally entered into, executed by Manigault and Ford on the one part and the defendants on the other. By these articles it was agreed that the dam should remain undisturbed until 31st December, 1898, and that from and after that date Manigault and Ford, their agents, servants, and employés, should have the right to open and keep open all or any part of the said banks and trunks over and across the said creek, and to remove all or any part of the banks and obstructions across the creek, so as entirely, or to such extent as they may see fit, to free and clear the creek from all or any part of such obstructions without any let, hindrance, objection, delay, or molestation whatsoever in act or procurance by the parties of the first part, their servants, agents, or employés. Pursuing the terms of this agreement, the obstructions were all removed from and after the 31st of December, 1898, and thenceforward no longer existed. The defendants deny the obligations of the contract, first, because it was without consideration; second, because it was made under duress; third, because it was with regard to a public matter concerning which the parties could not contract.

The contract was under seal, and this imports a consideration. Storm v. The United States, 94 U. S. 84, 24 L. Ed. 42. It contains mutual covenants, and they create considerations. Park Bros. & Co. v. Kelly, 49 Fed. 625, 1 C. C. A. 395. Nor can it be said to have been made under duress. Manigault and Ford made no threats of violence, nor did they make any move to abate the nuisance by their own act. They assert a legal right. The matter was placed in the hands of an attorney by them, whose age and experience forbid the idea of the adoption of any course not conservative and regular. He was referred by the defendants to a member of the bar of good stand-

ing, and these gentlemen conferred and corresponded, each seeking a mode of amicable adjustment, and finally maturing it. It must be borne in mind that the defendants, of their own motion, under an assumed authority of their own, had undertaken to dam this creek. They must have been uncertain as to their right to do so without an authority from the Legislature, and so they may have reasonably apprehended an indictment for a nuisance, or a suit for damages. It was important to them to maintain the dam at least to the end of the year, so as to save that crop. Very wisely they placed the matter in the hands of counsel, and they saved their crop without any litigation or prosecution. A compromise made under these circumstances has no element of duress. United States v. Child & Co., 12 Wall. 244, 20 L. Ed. 360; French v. Shoemaker, 14 Wall. 314, 20 L. Ed. 852; Carver v. The United States, 111 U. S. 609, 4 Sup. Ct. 561, 28 L. Ed. 540. Nor is the contract void because it relates to a public right. Oregon, etc., Co. v. Winsor, 20 Wall. 64, 22 L. Ed. 315; Hulse v. Bondsack Machine Co., 65 Fed. 864, 13 C. C. A. 180. Assuming that the contract was valid, does the act of the Legislature with regard to it come in conflict with the Constitution of the United States, in that it impairs the obligation of a contract? It must be noted that the act of Assembly makes no mention of and no allusion to any contract whatever. Apparently the act was passed in the exercise of legislative authority, and under the police power of the state. We cannot inquire, as has been seen, into the motive which may have controlled the Legislature. The doctrine of omnia præsumuntur applies to its acts. Assuming, then, that this act was passed in the exercise of the legitimate power of the state, the rule laid down in the Legal Tender Cases, 12 Wall., at page 551, 20 L. Ed. 287, applies to this act:

"As in a state of civil society property of a citizen or subject is subject to the demands of the sovereign, so contracts must be understood as made in reference to the possible exercise of rightful authority of the government, and no obligation of a contract can extend to the defeat of legitimate government authority."

So, also, in Mitchell v. Clark, 110 U. S. 633, 4 Sup. Ct. 312, 28 L. Ed. 279, where the question of the power of Congress arises, it does not depend upon the incidental effect of its exercise on contracts, but on the existence of the power itself. It is well to examine this contract more minutely, and ascertain precisely what it is. The defendants, without the authority of the state, in whom alone is the right to close a stream in this creek, had built a dam across Kinloch creek with a trunk and floodgate on each side thereof; the trunk and floodgate being on their own lands. The complainant and Mr. Ford objected. After notice of the objection and negotiations thereon, this contract was made. It is an indenture between these defendants, parties of the first part, and Manigault and Ford, parties of the second part. It recites that all the parties to the deed were owners of land on the Santee river, adjacent to or in the neighborhood of Kinloch creek and White Oak creek; that there are now—that is, at the date of the deed—banks across the said creeks, with a trunk on the bank across White Oak creek, and a bank across Kinloch creek with

a trunk and floodgate on each side thereof; that the parties of the second part claim that they have the right to keep open all the time and remove said banks and floodgate and trunks as obstacles to navigation, and to the free ingress and egress of the water, and to the parties themselves using the said creeks as highways, and that the parties of the first part object to such removal, and claim that they should not be removed. Then come the considerations and the covenants. The important covenant is this:

"First. That from and after the 31st December, 1898, the said parties of the second part, Manigault and Ford, their agents, servants and employés, shall have the right to open and keep open all or any part of the said banks and trunks over and across the said two creeks, and to remove all or any part of the said banks and obstructions across the said creeks, so as entirely or to such extent as they may see fit, to free and clear both of said creeks, or either of them, from all or any part of such obstructions, without let, hindrance, objection, delay or molestation whatsoever, in act or procurance, by the parties of the first part, their servants, agents or employés."

Now, this contract speaks of the then existing claim of right by the complainant and Ford to the removal of the then existing obstruction, and of the covenant of the defendants to remove the same. They were put up by defendants under a claim of right in themselves to do this. This claim was abandoned, and the obstructions in due time were thoroughly removed, without any let, hindrance, objection, delay, or molestation by the parties of the first part whatsoever, or any of their servants, agents, or employés. Has not this contract been performed? All that it binds the parties to do has been done. The obstruction has been entirely removed. Nothing is said of the future. But good faith requires that Ward & Co. should not, having entered into this contract, proceed to repeat what Manigault and Ford complained of. They would subject themselves to the same proceeding; perhaps be met at once with an indictment for a nuisance. But, having abandoned all claim in their own right to erect such a dam, it does not prevent them from using—indeed, from seeking a legal authority for the erection of—a dam. Their previous act being unlawful, they were exposed to a prosecution or for damages. Now, however, the state has come in, and by the exercise of her police power has sanctioned the obstruction of the dam. The action of the defendants is no longer unlawful. The state has made it lawful; and, under the authorities quoted above, if the contract forbid a renewal of the erection of the dam, this did not preclude or prevent or include the acts of the state.

This case has been heard and conclusions of fact reached upon evidence introduced by affidavits, the most unsatisfactory mode of proof. A full hearing, accompanied by the examination and cross-examination of witnesses, may change or modify these conclusions. As at present advised, this court does not feel that it is a case which will justify exercise of the extraordinary powers of this court in granting an injunction. And it is so ordered.