## UNITED STATES *v.* CHILD & CO.

1. The doctrine of the case of *United States* v. *Adams* (7 Wallace, 463), affirmed and held to govern the case.
2. Neither in that case nor in this was the voluntary submission of a claim against the government to the special commission appointed to investigate such claims essential to bar a recovery against the United States.
3. The bar in both cases rested upon the voluntary acceptance by the claimants of a smaller sum than their claim as a full satisfaction of the whole, and acknowledging this in a receipt for the amount paid; the demand having been disputed for a long time by the government, and the smaller sum accepted without objection or protest.
4. Such acceptance being without force or intimidation and with a full knowledge of all the circumstances, the fact that the sum was so large that the claimants were induced by their want of the money to accept the less sum in full is not duress.

APPEAL from the Court of Claims, on a claim by Child & Co., merchants of St. Louis, against the United States for $163,111, as a balance due on a sale of military stores.

The Court of Claims found a case which in the parts material was thus:

1st. In the autumn of 1861, and before the 14th of October of that year, the city of St. Louis being the headquarters of the Department of the West, Major McKinstry, chief quartermaster of the department, under the express orders of Major-General

Fremont, commanding the department, purchased stores of the claimants, the fair value of which was $478,119.62, the price charged by the claimants.

The payment of the quartermaster vouchers held by the claimants was suspended by the Secretary of War, in common with all others issued before the 14th October, 1861, by reason of suspected frauds, extravagance, and irregularities in the Department of the West.

On the 25th October, 1861, a military commission, consisting of the Honorable David Davis, of Illinois; the Honorable Joseph Holt, of Kentucky, and Mr. Hugh Campbell, was appointed by the Secretary of War, whose powers and duties were defined to be to report upon all unsettled claims against the military Department of the West that might have originated prior to the 14th of October, 1861.

After the committee had entered upon its investigations, the provost-guard of St. Louis forcibly entered the office of the claimants, and against their consent seized and carried before the commission their vouchers, business papers, and private books of account. The commission examined them all, and at the conclusion of its investigations indorsed upon the vouchers the amounts allowed by *it*, and ordered that the sum of $163,111 be deducted from the vouchers. The commission also withheld all of the vouchers until the claimants signed a receipt or agreement, *not under seal and without consideration*, which provided that when the reduced amounts allowed by the commission should be paid, the payment should be in full of all the claimants' demands against the United States. The claimants on their part *never submitted their vouchers to the arbitration or decisions of the commission*, and did not sign the receipt voluntarily, but under protest and to obtain possession of their vouchers withheld until they should do so.

The claimants after receiving back from the commission their vouchers presented them for payment to the Quartermaster-General, but the disbursing officer of the United States refused to pay the same, on the ground that he had no legal authority to do so, and continued to refuse payment until the enactment by Congress of a joint resolution approved 11th March, 1863:

"That all sums allowed to be due from the United States to individuals, by the commission heretofore appointed by the Secretary of War," "shall be deemed to be due and payable, and

shall be paid by the disbursing officers in each case, upon the presentation of the voucher, with the commissioners' certificate thereon, in any form plainly indicating the allowance of the claim and to what amount."

Thereupon the Quartermaster-General "referred the said vouchers to Major M. S. Miller, quartermaster, for payment, under the above quoted joint resolution of Congress;" and Major Miller, in pursuance of this order, paid to the claimants, upon these vouchers, the amounts allowed by the commission.

The claimants, at the time of receiving payment, made no formal objection or protest, but were required to, and did, sign a receipt *not under seal and without consideration*, whereby they acknowledged having received such reduced amounts "in full of the above account."

Such were the facts as found by the Court of Claims. The court did not find anything about Child & Co.'s having accepted the amount reported as due by the commission, because they would have become bankrupt had they not done so. But in the *opinion* of the Court of Claims, as given in the official report of the case, the court,* in speaking of the receipts which Child & Co. had given for the money, says:

Of these receipts two things may be said: In the first place, the acts of the commission had taken from the claimants their business books of account; had suspended their business transactions; *had reduced them to the verge of bankruptcy*, and had been constantly met by the claimants' repeated and most earnest protests.

The Court of Claims, as a conclusion of law upon the *facts found in their finding*, decided,

1st. That the purchases were lawful and valid.

2d. That neither Congress nor the claimants having submitted the controversy to the arbitrament of the commission, the said commission was not possessed of jurisdiction or power to determine the rights of the parties, and that the deductions

---

* 4 Court of Claims Reports, 185.

made by the commission from the claimants' vouchers did not constitute a valid or binding award. And further, that the agreement or receipt, signed by the claimants on receiving back their vouchers, was obtained and exacted by duress of their goods, and was wholly without consideration, and void.

3d. That the joint resolution approved 11th March, 1863, was simply an authority and direction, to the defendants' disbursing officers to pay the amounts allowed by the commission; and that the resolution did not ratify the reductions made by the commission from the claimants' vouchers, nor change, nor affect the legal rights and liabilities of the parties. That the payment of the reduced amount made to the claimants under the resolution by the express order of the quartermaster-general, and its acceptance by the claimants, without objection or protest, did not estop or conclude the claimants from seeking legal redress for the balance remaining due upon their accounts; and that the receipts required by the quartermaster at the time of payment, expressing upon their face that a less sum was received than that due, and being without consideration, did not operate as a release of the balance of the claimants' accounts, and were wholly void.

The Court of Claims accordingly decided that the claimants should recover the balance claimed, to wit: $163,111.

From this decision the United States appealed to this court. The case being here, it was remanded at the request of the government to the Court of Claims for certain additional findings, on questions raised. The supplemental findings found:

1st. That the claims of the claimants were never submitted to the commission, either before or after the seizure of the books and papers; but that, before the seizure, the claimants, in pursuance of the published notice of the commission (requiring all claims which had accrued before the 14th of October, 1861, to be presented to it), had in some manner, not shown to the Court of Claims, presented or given notice of their claims against the defendants to the said commission. But that the claimants had not presented their original vouchers, nor any proofs to the commission.

2d. That after the seizure, and while the books and papers

were withheld from the claimants by the commission, the claimants did appear before the commission with witnesses; but what the witnesses testified, or whether or not they were produced before the commission to support the claims, did not appear at the trial.

The claim, as the reader will have observed, belonged to a class of demands against the government, originating at St. Louis in the early days of the civil war, and which by order of the President were investigated at the time by a special commission appointed for the purpose. In some respects, therefore, it resembled the cause of *United States* v. *Adams*, twice passed on in this court;[*] first on an appeal, the record of which stated that Adams had presented his claim to the commission, and the second—after a decision of that appeal by this court, in which decision it was assumed that Adams had " voluntarily submitted his claims to the adjudication and decision of the said commissioners "—on a motion by Adams to refer the case back to the Court of Claims, because it had erroneously found as a fact, that he had voluntarily presented his claims, whereas, the truth was —as was shown on the motion—that he had not presented them himself at all, but that General Meigs, head of the bureau of a department of this class of claims, had presented them, and that they had been heard *ex parte.* In the opinion on the appeal (the first case),[†] this court—admitting fully that the commission had no legal authority to compel a hearing before them, and that he might have gone to the Court of Claims—held the fact to be that Adams had " voluntarily submitted his claims to the adjudication and decision of the said commission," and adverting to this and to the fact that after the award by the commission of a smaller sum than that claimed, Adams took it and gave a receipt—a document which the government set up as concluding him, while *he* contended that he was free to explain it—the court declared that:

" In the view we have taken of the case, the giving of the

---

[*] 7 Wallace, 463; 9 Id. 554.          [†] 7 Wallace, 479, 481.

receipt is of no legal importance.   The bar to any further legal demand against government does not rest upon this acquittance, but upon the *voluntary submission of the claims to the board;* the hearing and final decisions thereon; the receipt of the vouchers containing the sum or account found due to the claimant, and the acceptance of the payment of that amount under the act of Congress providing therefor. . . . So far as respects the cases of *voluntary submission* before the board, we regard the finding followed by acceptance as conclusive as if it had been before the first Court of Claims, and heard and decided there, and the amount found due paid by the government."

In the second case* (the motion to remand), the court say:

"Though it is true that the appellee did not present his claim to the board, as stated in the finding in the record on appeal, it cannot, in view of the original record of the evidence before the Court of Claims, be denied that he made himself a party to the proceedings and took the benefit of the adjustment of his accounts by them, which brings the case within the principle decided in 7th Wallace."

*Mr. B. H. Bristow, Solicitor-General, and Mr. C. H. Hill, Assistant Attorney-General, for the United States:*

We rely on *United States* v. *Adams.*   There are no distinguishing facts.   The Court of Claims, indeed, in their additional findings in the present case, find that the claim in this case was never submitted to the commission; but while thus finding they proceed to find further, "that, before the said seizure, the claimants, in pursuance of the public notice of the said commission, had, in some manner not shown to the court, presented or gave a notice of their claims to the said commission."   This last statement contradicts, as matter of fact, the finding that the claims were never submitted, and shows that that was rather a conclusion of law from the facts than a finding of a question of fact, and that upon the *facts* found by the Court of Claims, it was an erroneous conclusion.

No particular form of submission of claims has been estab-

* 9 Wallace, 554.

lished by the commissioners or by the Secretary of War, and if the claimants had "in some manner presented or given notice of their claims to the said commission," such presentation or notice of their claims could constitute nothing but a submission of them for investigation. Moreover, the Court of Claims finds further, "that the claimants did appear before the said commission with witnesses," which establishes the fact, that they did actually submit their claims to the consideration of the commissioners.

Whether the receipt given by the respondents to the commission at St. Louis was extorted by duress, or by the illegal withholding of their vouchers, is immaterial. The respondents did get back their vouchers, and they did afterwards, when under no "duress," accept the money allowed them by the commission under the joint resolution of Congress, as the Court of Claims admits, without formal protest. This payment of the money, a final settlement, was an accord and satisfaction of the whole demand.

*Messrs. H. E. Davis, Bartley, and Casey, contra:*

The good faith of the appellees and the fair price of their stores sold, being expressly found, the question is whether the acceptance by them of the amount awarded by the commission bars a recovery of the balance.

The acceptance is not a ratification of the action of the commission, nor a sufficient ground of reversal of the judgment of the Court of Claims.

1st. Because the finding of said commission was not an *award.*

This conclusion results from the *fact* expressly found, that the appellees did not at any time present or submit their claims to the jurisdiction or arbitrament of said commission. In the case of *United States* v. *Adams*, it was decided that the authority of the commission to decide upon the claim resulted from the *voluntary* submission of the claimant. That fact being wanting in this case, removes the only foundation upon which an award by the commission can be sustained.

2d. Because the facts found by the Court of Claims are not sufficient to constitute an *accord and satisfaction.*

In order to support a legal accord and satisfaction, there must be some new consideration moving from the party who sets it up. The payment of part of a debt in consideration of the creditors relinquishing the residue, where the whole debt is due at the time, will not support a plea or averment of accord and satisfaction. This is settled law, since Pinell's case, reported by Coke, followed by. Pratt, C. J., in *Cumber* v. *Wayne;*[*] also more explicitly by Lord Ellenborough in *Fitch* v. *Sutton,*[†] and now firmly established in nearly every State in the Union.[‡]

3d. Because the acceptance by the appellees of the money awarded by the commission does not of itself furnish evidence that the appellees accepted payment of such sum as a *compromise.* There is not a single fact in this case which sustains such an assumption. A *compromise* as defined by Mr. Justice Bouvier in his valuable Law Dictionary, is "an agreement between two or more persons who, to avoid a lawsuit, settle their differences on such terms as they can *agree upon.*"

The *opinion* of the Court of Claims, given in the official report of this case below, tells the circumstances under which the money paid on these contracts was received by the appellees. This opinion, though indeed no part of the findings or of the record, is of course founded on the evidence given in the case, and is to be entirely relied on. It shows that the court had in its mind, as a very important element of the case, a fact omitted to be found specifically in the technical "finding;" but which, of course, they supposed would be obvious from the nature of the case.

Payment was accepted, because, from the outlays which Child & Company had made on behalf of the government, they were "*reduced then to the verge of bankruptcy.*" The sums dealt in were very large. That house—indeed few houses—could long remain out of so vast a sum and not become bank-

---

[*] 1 Strange, 426.  [†] 5 East, 232.

[‡] 1 Smith's Leading Cases, notes to Cumber *v.* Wayne.

rupt. The government cannot be subjected to the influences which oblige private debtors to pay their debts. It pays no interest for withholding even the greatest sums, though, by confession, justly due. Acceptance of payment from such debtors, in such an emergency as Child & Company were placed in by the non-payment, was payment accepted under duress. Formerly, indeed, it was held that illegal restraint of the person was necessary to constitute duress, and that a detention of papers or goods of the party would not be duress. That doctrine is now, by numerous cases, exploded.* Indeed, in *Astley* v. *Reynolds*, so far back as the time of Strange,† speaking of a payment of money made under prudential influences, the court says: " We think also this a payment by compulsion. The plaintiff might have such an immediate want of his goods that an action of trover would not do his business. Where the rule *volenti non fit injuria* is applied, it must be where the party has his freedom of exercising his will."

The defence made by the receipt of a part of the claim, is at best one of the most technical character, and by a proud government ought not to be allowed to defeat a claim, if it be a just one, for property advanced to it in a crisis. where its very existence was in peril, and in a region where the claimants were the faithful few among the faithless.

Mr. Justice MILLER delivered the opinion of the court.

The claim of the appellees for the sum of $478,119.62 was examined by the special commission appointed by the President. It allowed the sum of $315,008.15 on the demand, and rejected the remainder of $163,111.47. The claimants accepted the sum so allowed by the commission, gave re-

---

* White *v.* Heylman, 10 Casey, 142; Ripley *v.* Gelston, 9 Johnson, 201; Wheeler *v.* Smith, 9 Howard, 55; Elliott *v.* Swartwout, 10 Peters, 187; Hearsey *v.* Pruyn, 7 Johnson, 179; Ashmole *v.* Wainwright, 2 Queen's Bench. 837; Wakefield *v.* Newbon, 6 Ib. 281; Parker *v.* The Great Western R. R. Co., 7 Manning & Granger, 253; Harmony *v.* Bingham, 1 Duer, 229; Shaw *v.* Woodcock, 7 Barnewall & Cresswell, 73; Atlee *v.* Backhouse, 3 Meeson & Welsby, 633.

† 2 Strange, 916; and see Collins *v.* Westbury, 2 Bay, 214.

ceipts in full of the accounts included in the demand, and have brought this suit to recover the amount rejected by the commission.

These facts are undisputed, and part of the findings of the Court of Claims in the case. If they stood alone they would bring it within the principles laid down by this court in the case of the United States against Adams. That case was twice argued before us and affirmed by a full bench, and as we are satisfied with the principles on which it was decided they must govern us in passing on subsequent cases, so far as they fall within its rulings.

But the claimants contend that other facts found by the Court of Claims take this case out of the propositions laid down for the government of that case, and entitle them to an affirmance of the judgment rendered in their favor by the Court of Claims. An important difference between the two is said to exist in the fact that Adams voluntarily submitted his claim to the commission we have mentioned, and the claimants in this case did not. And it is insisted that this submission constituted an important, if not a controlling element in the decision of the Adams case.

The court in discussing the question of the conclusiveness of a receipt which Adams had given in order to obtain possession of his vouchers, and which he asserted to have been obtained by duress, says: " In the view we have taken of the case, the giving of the receipt is of no legal importance. The bar to any further legal demand against government does not rest upon this acquittance, but upon the voluntary submission of the claims to the board; the hearing and final decision thereon; the receipt of the vouchers containing the sum or account found due to the claimant, and the acceptance of the payment of that amount under the act of Congress providing therefor."

Counsel for the claimants construing the phrase "voluntary submission," here used, to mean such a submission as would constitute the commissioners a board of arbitrators, or at all events, such a submission as would render their decision legally conclusive, deny that the parties in the present

case ever made such a submission. As much importance seems to have been given to this question by both parties, an order was obtained from this court on motion of the appellants directing the Court of Claims to make a more specific finding of facts on that subject. Such a supplementary finding is in the present record, and that court says, among other things, that the claims of the claimants were never submitted to said commission. But they further say in this supplementary finding, that the claimants had, in some manner not shown to the court, presented or given notice of their claim against the United States to the said commission, but that they had not presented their *original vouchers*, or any proofs, to the said commission. They also find that the claimants appeared before said commission with witnesses, but what they testified to is not shown.

Taking these findings together, it seems to us that the Court of Claims meant to say that the claimants did not submit their claims to the commission as arbitrators, or with intent that their decision should be conclusive, but that they did present their claims and did appear to support them with witnesses. This view of their meaning is confirmed by reference to their original finding, in which it is said that "claimants on their part never submitted their *vouchers* to the *arbitration* or *decision* of the commission." No doubt these were the facts of the case; and as to this part of it they come fairly within the decision of the court in Adams's case.

In the opinion of the court then delivered, it is held that this board had no authority to compel parties to submit their claims to it, and that its decisions were not conclusive when they did submit them. The court, referring to the various ways open to claimants to obtain satisfaction of their demands, and after speaking of an application to Congress, a suit in the Court of Claims, and a submission to this special commission, adds: "This tribunal afforded an additional advantage over others, namely, that if, after the hearing and adjustment of the claims, the claimants were not satisfied, they were free to dissent and look for redress to the only

legal tribunals provided in such cases." And to the application of Adams to remand the case to the court below, founded on the allegation that the Court of Claims had made a mistake in finding that he had submitted his claim to the board, this court responds:* "Though it is true that the appellee did not present his claim to the board, *as stated in the finding in the record on appeal,* it cannot, in view of the original record of the evidence before the Court of Claims, be denied that he made himself a party to the proceedings and took the benefit of the adjustment of his accounts by them, which brings the case within the principle decided in 7th Wallace."

But though the claimants might have refused to abide by the decision of the board and sought relief from the Court of Claims or from Congress, they did not do so.

We lay out of view in this case, as in the Adams case, the receipts which they gave, under protest, in order to regain possession of their vouchers. But we cannot disregard the finding of the Court of Claims that, after Congress had appropriated money to pay the sums found due by the commissioners, the claimants received the amount so allowed, and signed upon each voucher a receipt whereby they acknowledged having received said reduced amount "in full of the above account." And that at the time of receiving this payment they made no formal objection or protest, but were required to and did sign the receipt above described.

Although it is found by the court that these receipts were not under seal and were without consideration, the latter statement must have some meaning not apparent to us, in view of the other fact found also, that over $315,000 was paid to the claimants on those accounts at the time they gave the receipts.

To avoid the legal effect of these facts it is argued that not only in giving the receipts above mentioned, but also in accepting the money for which they were given, the complainants acted under duress.

* 9 Wallace, 554.

We can hardly conceive of a definition of duress that would bring this case within its terms. Authorities are cited to show that where, under peculiar circumstances, property is withheld from the owner and he is forced to pay some unjust demand to obtain possession of it, he can afterwards maintain a suit for the money so paid. But no case can be found, we apprehend, where a party who, without force or intimidation and with a full knowledge of all the facts of the case, accepts on account of an unliquidated and controverted demand, a sum less than what he claims and believes to be due him, and agrees to accept that sum in full satisfaction, has been permitted to avoid his act on the ground that this is duress. If the principle contended for here be sound, no party can safely pay by way of compromise any sum less than what is claimed of him, for the compromise will be void as obtained by duress. The common and generally praiseworthy procedure by which business men every day sacrifice part of claims which they believe to be just to secure payment of the remainder would always be duress, and the compromise void.

But it is argued that the government should be held to a different rule than that which applies to private parties. It is said that the amount in dispute here was so large that the claimants were compelled to accept what was offered, to avoid bankruptcy.

No fact found by the Court of Claims, or otherwise presented by the record, justifies us in supposing that the claimants were threatened with insolvency, and the circumstance that the claim which was the subject of the compromise was a very large one can hardly be accepted in a court of law or equity as a reason for setting it aside. If indeed there was any such pressing motive in the minds of the claimants arising out of the condition of their private affairs as influenced them strongly to accept the offer of the government, it cannot, in the absence of fraud or constraint on its part, invalidate the settlement.

It seems to us that this case, under the ordinary principles of law applicable to its class, is free from embarrassment.

If there had been no reference to, and no finding by, the commission, it would still remain true, that here was a claim, the justice of which had been denied and the amount that was due on it had been in dispute for nearly two years. The government finally says to the claimants: "We will pay you a certain sum on this disputed claim provided you will take it in full satisfaction of the whole;" when, without intimidation, without fraud or concealment on the part of the government, without protest or objection on their part, the claimants accept the money offered and sign a receipt acknowledging it to be in full of the whole claim. Is not this a legal and binding compromise of the disputed demand? Is it not a voluntary adjustment of the matter in dispute between the parties? And we think that it is a strong additional argument in favor of the validity of this settlement, when it is called in question in court, that the sum so agreed upon was found to be a balance justly due on the claim by a commission of three capable and honest men, appointed by the government to ascertain what was due, and that before this commission the other party presented his claim and produced his witnesses, and was allowed a full and fair hearing to any extent that he desired.

In this view of the case it is of no avail to urge that the Court of Claims has found that the whole claim was just and ought to be paid. After the compromise that question was no longer open to inquiry. It is of the very essence of such adjustments of disputed rights that the contest shall be closed; and whatever consideration might be given the finding of the Court of Claims on that subject in another department of the government, this department, which sits to administer the law, must be governed by its recognized principles.

JUDGMENT REVERSED and the case remanded to the Court of Claims, with directions to render judgment

IN FAVOR OF THE UNITED STATES.

Mr. Justice CLIFFORD, with whom concurred the CHIEF JUSTICE, dissenting:

The Court of Claims having found that the claim in this case was never submitted to the commission appointed by the direction of the President to examine such claims, I am unable to concur in the conclusion of the court that the case is controlled by the decision of the court in the case of *United States* v. *Adams*, in 7th Wallace, and for the reason that the claim was never so presented.

DAVIS and FIELD, JJ., absent.