ROY CHARLIE BEAUCHAMP, JR., v. CLIFFORD STONEWALL CLARK, JR., AND PILOT FREIGHT CARRIERS, INC.

(Filed 29 April, 1959.)

1. **Automobiles § 41c— Conflicting evidence as to which vehicle was on wrong side of highway requires submission of the issue to the jury.**

The vehicle operated by plaintiff and the vehicle owned by one defendant and operated by the other, traveling in opposite directions, collided or "sideswiped" each other, resulting in serious personal injury to plaintiff and damage to both vehicles. There was conflict in the testimony as to which vehicle was over the center line of the highway and diverse inferences were permissible from the physical facts in evidence, including the damage to the respective vehicles and skid marks. *Held:* The conflicting evidence was for the determination of the jury, and the denial of defendants' motion to nonsuit was without error. G.S. 20-148.

2. **Automobiles § 39—**

In view of the great weight of the respective vehicles, the physical damage resulting from the collision in suit *held* not to establish as a

matter of law that plaintiff's vehicle was being operated at such a high rate of speed as to constitute a violation of statute or the rule of the prudent man, plaintiff's vehicle being a ton and a half truck, loaded with cinders, and defendants' vehicle being a tractor-trailer with a load weighing some 33,000 pounds.

**3. Same: Automobiles § 41a—**

The physical facts at the scene of a collision cannot warrant nonsuit if they are not in harmony and diverse inferences can be drawn therefrom.

**4. Compromise and Settlement—**

Authority of the person negotiating a compromise settlement is necessary for the settlement to bar the alleged principal.

**5. Same: Insurance § 62—**

Provisions of a policy of liability insurance authorizing insurer to make investigation, negotiation and settlement of any claim against insurer as it deems expedient, and including in its coverage a person driving the vehicle with the permission of insured, do not authorize insurer, in obtaining a compromise settlement with the other party involved in the collision for damage to the other vehicle, to settle the claim for serious personal injuries sustained by the person driving the insured vehicle with the permission of insured, even though he was advised by insurer's agent that insurer was going to settle the claim for damages to the other car, there being nothing to indicate that he was informed that insurer was planning to give away his claim for personal injuries, and it appearing that he consistently denied that he was at fault.

**6. Appeal and Error § 42—**

The charge of the court will be construed as a whole, and exceptions thereto will not be sustained when the charge so construed is a correct instruction upon the law.

APPEAL by defendants from *Sharp, S.J.,* December 1, 1958 Term of FORSYTH.

*Hayes & Wilson for plaintiff, appellee.*
*Womble, Carlyle, Sandridge & Rice for defendant, appellants.*

RODMAN, J. Defendants appeal from a judgment awarding plaintiff damages for personal injuries sustained in a collision which occurred about noon 5 December 1956 on U. S. Highway 158. Plaintiff was driving his father's ton and a half 1950 Chevrolet truck westwardly from Winston-Salem towards Mocksville. The truck had an overall length approximating eighteen feet. It had a stake body and dual wheels on the rear. It was loaded with cinders.

Defendant Clark was driving a tractor-trailer for defendant Pilot Freight Carriers, Inc. (hereafter designated as Pilot) in an eastward

direction from Mocksville towards Winston-Salem. The tractor-trailer had an overall length of 44½ feet. The tractor had a Diesel motor, was 14 to 16 feet long. It was equipped with two wheels on the front and dual or four wheels on a single axle on the rear. It weighed approximately 11,000 pounds. The trailer was connected to the trailer by means of a "fifth wheel" on the tractor. The trailer fits on this "fifth wheel" and is held in place by a king pin. Near the rear of the trailer were two axles separately connected to the trailer. Each axle carried dual or a total of four wheels per axle. The body of the trailer was approximately four feet from the ground. It was twelve feet high. The body was of stainless steel or aluminum with vertical ribs on the side to provide additional strength. The trailer weighs about 10,000 pounds. It was loaded with carbon. The cargo weighed about 33,000 pounds. The gross weight of the vehicle and cargo was approximately 54,000 pounds.

Plaintiff based his right to recover on his assertion that the tractor-trailer was being operated at an unreasonable speed and on the wrong side of the road; that Clark failed to keep a proper lookout and failed to yield the right of way to oncoming traffic.

Defendants denied the allegations of negligence and pleaded contributory negligence on the part of plaintiff, asserting plaintiff was driving his vehicle at an unreasonable rate of speed and on the wrong side of the road and failed to keep a proper lookout and to yield the road to oncoming traffic.

The first asserted error presented by defendants is the refusal to allow their motion to nonsuit. This motion is based on the contention that the physical facts observed after the collision demonstrate as a matter of law plaintiff's negligent operation of his motor vehicle, proximately causing his injuries.

The collision occurred near Sheets Barbecue, a restaurant situate on the north side and about 150 feet from the highway. The space between the restaurant and the highway was unobstructed. Traveling west in approaching Sheets Barbecue there is a slight decline and curve to the driver's right.

Plaintiff testified: "When I was coming around this curve I saw this Pilot truck; he was approximately 2 to 3 foot across the line on my side of the road, and when I saw him I applied my brakes, and the first thing that I remember hitting was the drive wheel, which is the first set of dual wheels on the tractor, right behind the cab. Then I went on down the side of the trailer, made marks down the side of the trailer." Plaintiff fixed his speed at 35 to 40 m.p.h. and that of the tractor-trailer at 35 m.p.h.

A witness at the restaurant testified: "I heard the racket from the wreck, and when I did, I turned around and saw Mr. Beauchamp's truck spinning around. At the time I first glimpsed it, Mr. Beauchamp's truck was headed west, and it made a complete turn and headed back east. When I first saw Mr. Beauchamp's truck he was on the right side of the highway."

An employee at the restaurant testified: "As I stood there and looked out that window, I saw the two vehicles just before they hit, just a few seconds, and the transfer truck was around a foot on Beauchamp's side of the road. When I speak of the 'transfer truck,' I am speaking of the Pilot truck. Mr. Beauchamp was on his side of the road."

Defendant Clark testified that he was passing westbound traffic. One of the vehicles by signal indicated it intended to turn to the right to go to the restaurant. The following vehicle slowed down. Plaintiff was behind that vehicle. Plaintiff was 150 to 160 feet from Clark when he rounded the curve and first came in Clark's sight. Plaintiff was then traveling approximately 60 m.p.h. Clark was traveling 25 to 30 m.p.h. When he first saw the Chevrolet, the driver had applied his brakes, "and I noticed that the Beauchamp truck's rear tires were sliding, and he got, I would say, somewheres around 30 feet of me, and the wheels quit sliding, and he just angled across the road and hit me as I have described, my left wheels were I would say roughly about two feet from the center line, to the south side of the center line. When I say 'left wheels,' I am referring to all of the wheels, the tractor wheels and the trailer wheels."

Following the collision the Chevrolet was to the north of the center line of the highway, headed in a northeasterly direction, partly off the highway. The front wheels were broken, the hood badly crushed, with a crease in it from which it could be inferred that it had been caught under the trailer. The cab was injured. The panel on the right side of the body was gone.

The tractor was headed south, occupying practically all of the south lane of the highway. The trailer, still coupled by the fifth wheel, was headed in an easterly or southeasterly direction. The right rear wheels were south of but within a few inches of the white line marking the center line of the highway. The front end of the trailer was likewise over the center line of the highway but occupied less of the north lane than did the rear end. The left tire on the drive wheel of the tractor had burst and the wheel had been knocked back 2 or 3 inches. This disconnected the drive shaft and dropped it on the ground. One of the upright ribs on the body had been knocked off. The body

was otherwise damaged on the left side. There were signs under the body showing where it had been scraped. The left forward axle under the trailer was broken loose and knocked back and out of alignment. Clark testified: "When the left part of my tractor was struck, I was knocked into the floorboard, down underneath the steering wheel, between the seat and the brake pedals, and so forth. After the collision took place, the wheels being knocked out of line and the road slanting there, my unit rolled down across the white line, and the tractor went into a jackknifed position. I'd say my tractor-trailer traveled around 8 feet after the Beauchamp truck struck the tandem wheels on the lefthand side of the trailer."

Controversy exists as to brake marks made by the tractor-trailer. On the north side of the highway and to the east of the portion occupied by the vehicles after the collision were skid marks made by dual wheel tires. The northernmost of these skid marks were about eighteen inches from the north edge of the road. The southernmost were well to the north of the center line of the highway. These skid marks terminated abruptly some five feet or more from the rear of the trailer. These skid marks were apparently made by the Chevrolet.

Does this evidence force one to a single conclusion as to the cause of the collision? The answer must, we think, be in the negative. Where were the vehicles prior to the collision? If plaintiff's testimony is accepted, he was to his right of the center of the highway, and Clark was to his left. If so, Clark was violating the statute which commands: "Drivers of vehicles proceeding in opposite directions shall pass each other to the right, each giving to the other at least one-half of the main-traveled portion of the roadway as nearly as possible." G.S. 20-148.

The skid marks made by the Chevrolet may reasonably support plaintiff's assertion that having discovered Clark's violation of the law, he was trying to avoid a collision with the tractor-trailer.

That the vehicles came together with such force as to cause the damage depicted to each vehicle does not necessarily mean that the Chevrolet was being operated at such a high rate of speed as to demonstrate a violation of the statute law or the rule of the prudent man.

When the front portion of the vehicles came in contact, was the Chevrolet then moving or had it stopped? Does the termination of skid marks from its wheels indicate they had ceased to move? Would the momentum given to a mass moving with the velocity which Clark accords his vehicle produce the damage shown to that mass by striking a motionless body like the loaded Chevrolet? On these questions reasonable persons may reach different conclusions. That being true,

the court correctly overruled the motion to nonsuit. *Kirkman v. Baucom,* 246 N.C. 510, 98 S.E. 2d 922; *Jernigan v. Jernigan,* 236 N.C. 430, 72 S.E. 2d 912; *Winfield v. Smith,* 230 N.C. 392, 53 S.E. 2d 251; *Adcox v. Austin,* 235 N.C. 591, 70 S.E. 2d 837.

The factual situation presented in this case is readily distinguished from the situation depicted in *Powers v. Sternberg & Co.,* 213 N.C. 41, 195 S.E. 88. If physical facts can speak louder than living witnesses, all notes produced by the facts must be in harmony. Discord in the inferences drawn from physical facts requires a jury interpretation just as discord in parol testimony requires an evaluation before a final determination can be made.

Defendants pleaded compromise and settlement to defeat plaintiff's recovery. To establish their plea, they offered:

(1) A policy of insurance issued by Nationwide Mutual Insurance Company to plaintiff's father, owner of the Chevrolet truck. This policy provided insurance coverage for specified amounts with respect to designated risks. Coverage E, insuring against property damage liability, reads: "To pay on behalf of the Insured all sums which the Insured shall become legally obligated to pay as damages because of injury to or destruction of property, including the loss of use thereof, caused by accident and arising out of the ownership, maintenance or use of the automobile."

Coverage F provides protection in substantially the same language for bodily injury liability.

By definition of "insured" the policy covers and insures one who operates the vehicle with permission of the owner. Plaintiff was, at the time of his injury, operating with the permission of his father.

The policy contained this provision: "With respect to such insurance as is afforded by this policy under Coverages E, F and H. the Company shall: (a) defend any suit against the Insured alleging such injury, sickness, disease or destruction and seeking damages on account thereof, even if such suit is groundless, false of fraudulent; but the Company may make such investigation, negotiation and settlement of any claim or suit as it deems expedient."

(2) A release dated 15 January 1957 executed by Pilot. This release recites a payment of $2,565.72 for which Pilot released plaintiff and his father "from any and all actions, causes of action, claims, demands . . . and property damage resulting or to result from accident that occurred on or about the 5th day of December 1956, at or near Highway 158, Winston-Salem, Forsyth County, N. C." The sum paid represents the amounts expended by Pilot in repairing its vehicles.

The release contained this provision: "I/we understand that this

settlement is the compromise of a doubtful and disputed claim, and that the payment is not to be construed as an admission of liability on the part of the persons, firms and corporations hereby released by whom liability is expressly denied."

(3) A check of the insurer to Pilot for the sum stated in the release. This check shows the policy number, the claim number, and date of the collision. The check was paid by drawee bank.

(4) Parol testimony from Jack Hughes, an adjuster representing the insurer. This testimony was offered for the sole purpose of supporting the plea of settlement. Hughes testified that about a week after the collision he sent Mr. Smith to the hospital to ascertain from plaintiff how the collision occurred and the names of witnesses who could confirm plaintiff's statement. Smith reported to Hughes purporting to give plaintiff's version of the accident. (Plaintiff testified that he did not recall talking with Smith, and the attending physician testified that plaintiff probably would not remember because of the sedatives given plaintiff.) Smith's report of plaintiff's admission would tend to place responsibility for the collision on plaintiff. Hughes further testified that he made other investigations, including an interview with a highway patrolman who was at the scene shortly after the collision occurred. He testified that on 10 or 12 January he visited plaintiff in the hospital. He then told plaintiff that the investigation made by the witness indicated plaintiff was on the wrong side of the road and the collision was caused by plaintiff. He testified: "I explained to him that in view of the investigation, that if we did not pay Pilot for their damages, that they would, in all probability, file a lawsuit against him, and that since our investigation indicated that he was at fault, we would be in no position to defend him on that case, and, therefore, we felt that we would have to go ahead and pay for the damages.

"Mr. Roy Beauchamp, Jr. made no objection to the statements I made to him, just repeated, other than to say to the effect, 'I don't think I was at fault.'

"I had also told him what our investigation had disclosed, in the statement in my file, indicating that he didn't know which side of the road he was on at the time of the accident, and he didn't object to it, he just — and he didn't deny it. His main comment was that, 'I don't think I am at fault.' But I explained to him at that time that I would have to go ahead and make a settlement with Pilot Freight Carriers for their damages." The witness testified that following this conversation he entered into negotiations with Pilot, made the payment, and took the release from them.

It is conceded that plaintiff sustained serious injuries. He was in the hospital the first period from 5 December 1956 to 5 March 1957. He was subsequently hospitalized in April. Doctors testified that it will be some years yet before the full extent of his injuries can be definitely determined. While in the hospital he was given large amounts of sedatives.

The court held the settlement made by the insurer with Pilot did not bar plaintiff's action and for that reason excluded the evidence. Defendants assign this ruling as error entitling them to a new trial. The assignment presents the question: Does the evidence offered tend to establish the plea of compromise?

We quote, as a correct statement of the law, from the opinion of *Parker, J.,* in *Jenkins v. Fields,* 240 N.C. 776, 83 S.E. 2d 908. "A completed compromise and settlement fairly made between persons legally competent to contract and having the authority to do so with respect to the subject matter of the compromise, and supported by sufficient consideration, operates as a merger of, and bars all right to recover on, the claim or right of action included therein, as would a judgment duly entered in an action between said persons. *Snyder v. Oil Co.,* 235 N.C. 119, 68 S.E. 2d 805; *Hinson v. Davis,* 220 N.C. 380, 17 S.E. 2d 348; *Armstrong v. Polakavetz,* 191 N.C. 731, 133 S.E. 16; *Sutton v. Robeson,* 31 N.C. 380; 11 Am. Jur., Compromise and Settlement, Sec. 23."

It will be noted that authority with respect to the subject matter of the compromise is essential. Did insurer have any authority to defeat plaintiff's right to compensation for injuries which the jury has found were negligently inflicted on him by defendants? To establish such authority they rely solely on the policy provisions authorizing it to settle claims or suits against the insured, and the policy definition of insured. There is no suggestion that plaintiff paid any part of the premium or that he knew when he drove the truck that the driver was insured against liability for property damage to the amount of $5,000 and against personal injuries to the amount of $5,000 to one person with total personal injury liability amounting to $10,000, or in any way assented to the settlement.

The insurance company, although authorized to investigate, had not interviewed Craft and Blake, patron and employee of Sheets Barbecue, who saw the collision and testified that plaintiff was on his right side of the highway. True, representatives of the insurance company say they inquired of plaintiff if he could furnish it names of witnesses who would negative their conclusion that he was at fault, but plaintiff was at that time in a helpless condition in the hospital.

Apparently plaintiff located these witnesses after he left the hospital. When the insurer informed plaintiff of its conclusion that he was at fault and for that reason it intended to settle, he protested: "I don't think I was at fault." There is no suggestion that plaintiff was informed that the insurance company was planning to give away plaintiff's claim for personal injuries or that the company then so intended. The insurance company is not here contending that it used plaintiff's right of action for personal injuries to settle a claim for which it was primarily liable. That contention is made by defendants.

The company, for a stated compensation, had assumed contingent liabilities for maximum amounts. Here, as noted, the maximum liability for injury to any person is limited to $5,000. Is it conceivable that the insurer and the policyholder ever contemplated that the policy provision authorizing the insurer to settle claims was ever intended to vest the insurer with the right to obligate the policyholder for an unlimited amount over and beyond the amount the insurer was obligated to pay; or by settling a claim for property damage deprive the policyholder of his right of action for substantial permanent injuries? If the policy provisions are broad enough to permit such a settlement without specific assent from the policyholder, could it do so over the protest of the insured? Logic and a fair interpretation of the policy provision compel the conclusion that under the facts here depicted insurer had no authority to compromise and settle plaintiff's claim for the injuries tortiously inflicted on him.

This conclusion is in harmony with a practically unanimous line of decisions from other appellate courts. *Fikes v. Johnson,* 248 S.W. 2d 362 (Ark.), 32 A.L.R. 2d 934; *Foremost Dairies v. Campbell Coal Co.,* 196 S.E. 279 (Ga.); U.S.A.C. *Transport v. Corley,* 202 F. 2d 8 (applying Georgia law); *Burnham v. Williams,* 194 S.W. 751, compare *Keller v. Keklikian,* 244 S.W. 2d 1001 (Mo.); *Countryman v. Breen,* 271 N.Y.S. 744, affirmed by Court of Appeals, 198 N.E. 536; *Haluka v. Baker,* 34 N.E. 2d 68 (Ohio); *De Carlucci v. Brasley,* 83 A 2d 823 (N.J.); *Isaacson v. Boswell,* 86 A. 2d 695 (N.J.); *Daniel v. Adorno,* 107 A. 2d 700 (D.C.); *Last v. Brams,* 238 Ill. App. 82; *Perry v. Faulkner,* 102 A. 2d 908 (N.H.); *Jetton v. Polk,* 68 S.W. 2d 127 (Tenn.); *Hurley v. McMillan,* 268 S.W. 2d 229 (Tex.); *Graves Truck Line Inc. v. Home Oil Company,* 312 P. 2d 1079 (Kan.); *Bratton v. Speaks,* 286 S.W. 2d 526 (Ky.); 5A Am. Jur. 119 and 120.

The Supreme Judicial Court of Mass. has apparently reached a different conclusion. *Long v. Union Indemnity Co.,* 178 N.E. 737, 79 A.L.R. 1116.

Defendants assign as error portions of the charge. They contend

the portions excepted to unduly restrict the effect of statements by plaintiff against his interest. We think it apparent from an examination of the entire charge that the court carefully instructed the jury with respect to admissions by plaintiff. She expressly charged the jury that statements made by plaintiff were substantive evidence and admissible against him. She further charged that a failure to deny asserted wrongful operation of the truck could be taken as an admission. Considered as a whole and not as separate sentences, the charge is a correct statement of the law. This is the proper way to test the charge. *Keener v. Beal,* 246 N.C. 247, 98 S.E. 2d 19; *Vincent v. Woody,* 238 N.C. 118, 76 S.E. 2d 356; *In re Humphrey,* 236 N.C. 142, 71 S.E. 2d 915; *Hooper v. Glenn,* 230 N.C. 571, 53 S.E. 2d 843.

No Error.