**CLINTON STREET GREATER BETHLEHEM CHURCH, Intervenor-Plaintiff-Appellant,**

v.

**CITY OF DETROIT, Defendant-Appellee.**

No. 73-1083.

United States Court of Appeals, Sixth Circuit.

Argued June 6, 1973.

Decided Aug. 28, 1973.

\*    \*    \*    \*    \*

Barton W. Morris, Detroit, Mich., for appellant.

William J. Coughlin, Asst. Corp. Counsel, Detroit, Mich., for appellee; Michael M. Glusac, Corp. Counsel, Thomas J. O'Dowd, Asst. Corp. Counsel, Detroit, Mich., on brief.

Before PECK and McCREE, Circuit Judges, and O'SULLIVAN, Senior Circuit Judge.

JOHN W. PECK, Circuit Judge.

The history of this case stems back to a condemnation action begun by the City of Detroit in 1950. In that year, the City, preparatory to establishing a public housing project, filed a condemnation action in an area of the city designated "Mich. 1–11"; the appellant asked to be exempted from the condemnation pro-

ceedings. The city agreed upon the condition that the appellant purchase the remainder of the block upon which its church was situated, and the City agreed to give permission for the building of a new church building. Because of the exemption of this appellant from the condemnation proceedings, no notice of lis pendens was filed against the property, and the appellant was not required to and did not file a waiver of any requests for building permits. The appellant acquired the property, with the exception of two lots, and entered into a construction contract for a new church; construction on the new building began in 1958.

In 1960, the City discontinued the condemnation proceedings and in April of 1962 instituted a new condemnation suit for a federal urban renewal project. On November 22, 1961, a class action suit was brought by the affected residents against the City for losses sustained due to the way in which the area had been affected by the City's action. The District Court dismissed the action, Foster v. Herley, 207 F.Supp. 71 (E.D. Mich.1962), and this Court reversed, holding that the plaintiff had stated a cause of action, Foster v. Herley, 330 F. 2d 87 (6th Cir. 1964). Subsequently, upon trial, the District Court found that damages had been sustained by the plaintiffs, and a Special Master was appointed to determine membership in the class and to determine the extent of damages, 254 F.Supp. 655 (E.D.Mich. 1967). This Court affirmed that decision, 405 F.2d 138 (6th Cir. 1968).

Pursuant to the decision of the District Court, this appellant filed a claim with the Master. The District Court affirmed the Master's findings that the appellant was not a member of the class and that the claim for damages should be denied because a settlement had been reached between the appellant and the City in February, 1962, in the amount of $763,235.00. The appellant has perfected this appeal from that judgment.

As a preliminary matter, it must be determined whether this appellant is a member of the class as alleged in the original complaint. The class has been identified as "those property owners within the 'Mich. 1-11' area who have been subject to the dual condemnation actions here involved." 405 F.2d at 146.

The reference to dual condemnation actions is to the 1950 public housing project and the 1961 federal urban renewal project. Foster, the nominal plaintiff in the class action, was included in the 1950 condemnation case and a notice of lis pendens was filed against his properties. In the beginning, he could not obtain a permit to make repairs. His tenants were advised to leave and his unprotected property was vandalized. He had to bear the cost of demolition when the City declared his structures dangerous. In order to get a building permit, he had to sign a "waiver of claim." 254 F.Supp. at 662. In these respects, Foster is similar to Detroit v. Cassese, 376 Mich. 311, 136 N. W.2d 896 (1965), in which the Michigan Supreme Court relied upon similar affirmative acts by the City, including the filing of a notification of lis pendens, the sending of letters to tenants causing them to move, the making of intense building department inspections and citations against owners for any violations of the building code, the reduction of city services to the area, the razing of vacant and vandalized buildings, and the refusal to issue permits for substantial improvements, which were found to have constituted a "taking" of the property.

In this case, however, the appellant was exempted, at its own request, from the original 1950 condemnation action. There was no notice of lis pendens filed against its property, and the appellant had no trouble in obtaining building permits for the new church structure. And in spite of the fact that the area around was in a state of deterioration, the evidence indicated that the appellant's income rose steadily during the same period when Foster's property was being harmed (1958–60).

■ We are aware that an eminent domain taking can occur in the absence of formal procedures, such as the filing of a lis pendens and the formal notification of proposed condemnation actions, or without physical entry onto the land, Griggs v. Allegheny County, 369 U.S. 84, 90, 82 S.Ct. 531, 7 L.Ed.2d 585 (1962); United States v. Causby, 328 U.S. 256, 261, 106 Ct.Cl. 854, 66 S.Ct. 1062, 90 L. Ed. 1206 (1946); City of Cleveland v. Carcione, 118 Ohio App. 525, 190 N.E.2d 52, 57 (1963). In fact, it was the affirmative actions of the City in this regard which led this Court in the *Foster* decision to conclude that the point of the taking had occurred prior to the formal proceedings against Foster's property had begun, a conclusion which has been characterized by some commentators as defining a "de facto" taking. E. g.: B. Adams, Eminent Domain, Police Power and Urban Renewal: Compensation for Interim Depreciation in Land Values, 7 Ga.L.Rev. 226, 234–36 (1973). And although it may be true that the actions taken by the City in regard to this appellant may have constituted a de facto taking, that is not the issue for our determination. In order to come within the ambit of this Court's decision in *Foster*, the appellant must first establish his membership in the class represented by Mr. Foster. 405 F.2d at 142. The important distinction between the appellant's alleged harm and the problems encountered by Mr. Foster is that all of Mr. Foster's problems stemmed from his being subject to the 1950 condemnation action. *See* 330 F.2d at 88. The affirmative acts of the City which led the District Court to conclude that a taking had occurred prior to 1962 were all actions taken by the City in accordance with a condemnation action which it later abandoned, and including informing Mr. Foster that he would receive no compensation for improvements, advising him only to "keep the roof on and the water running"; requiring him to sign a waiver of claim for damages as a condition precedent to the issuance of a building permit (but waiving any claim to the increased value of the property as a result of the proposed improvements), completing the condemnation and clearance of several blocks in the area, and keeping the notice of lis pendens in effect for five years after the issuance of the stop order on the project, while at the same time, telling those who inquired that the property would be condemned soon. 254 F.Supp. at 662.

None of these factors pertain to this appellant, since this appellant was not subject to the 1950 condemnation action. Accordingly, the District Court correctly concluded that, other alleged damage notwithstanding, the appellant was not a proper member of the class and was not entitled to have his claim considered by the Master under the 1969 order of this Court.

■ In the alternative, the District Court adopted the finding of the Master that the two parties, the appellant and the City, entered into a mutually binding settlement of their dispute with full and complete knowledge of all the facts and circumstances while each was represented by competent counsel. When the City instituted the urban renewal condemnation action in 1961, the appellant had no objection to being included in the project, and the contractors were directed to stop construction on the new building. The City appraised the property (twice) and offered the appellant $463,238, which the appellant turned down. The City informed the appellant that it could not go beyond its two appraisals, and suggested that the appellant engage an engineer to appraise all the costs which the appellant had incurred, and that the appellant could present this appraisal to a jury for a final determination.

Accordingly, the appellant hired an appraiser who placed a value of $1,219,000 upon the appellant's property. When this appraisal was submitted to the City for consideration, the appellant was told that if the land had been worth that much, the City would have deleted them from the program and would have

left them there. The appellant has characterized this response as a threat by the City to either accept the City's offer or face the threat of being dropped out of the condemnation action. The Master and the District Court found that there was no evidence to support this interpretation, and that finding is not clearly erroneous. Negotiations were entered into, and eventually the parties settled the dispute for the amount of $763,238, or about $300,000 more than the City's original offer and about $400,000 less than the appellant's demand.

The appellant's contentions are that the City forced them into accepting this offer by threatening to delete them from the condemnation action, that the award is insufficient because it does not take into consideration certain expenditures made by the appellant and because the law of Michigan was subsequently changed concerning the time of valuation. We have already noted that the appellant's charge of a threat by the City was not substantiated. Similarly, the appellant's contention concerning the amount of the settlement is not well taken.

Although the District Court and the Master referred to this agreement as an "accord and satisfaction," it is more precisely a compromise and settlement, Bizzell v. Bizzell, 247 N.C. 590, 101 S.E.2d 668, 676, cert. denied, 358 U. S. 888, 79 S.Ct. 129, 3 L.Ed. 115 (1958), a method of resolving disputes which the law favors over litigation. Williams v. First National Bank, 216 U. S. 582, 595, 30 S.Ct. 441, 54 L.Ed. 625 (1910); Miller v. McGinnis, 285 Mich. 28, 280 N.W. 96, 100 (1938). Such a settlement is as binding, conclusive and final as if it had been entered in a judgment, Beauchamp v. Clark, 250 N.C. 132, 108 S.E.2d 535, 539 (1959); Galusha v. Sherman, 105 Wis. 263, 81 N.W. 495, 497 (1900); Theis v. Theis, 271 Minn. 199, 135 N.W.2d 740, 744 (1965), and the actual merits of the antecedent claims will not afterward be inquired into and examined. United States v.

Child, 79 U.S. (12 Wall) 232, 244, 20 L. Ed. 360 (1870); Aviation Corp. v. United States, 97 Ct.Cl. 550, 46 F.Supp. 491, 496 (1942), cert. denied, 318 U.S. 771, 63 S.Ct. 759, 87 L.Ed. 1141 (1943), Bohlman v. Big River Oil Co., 124 N.W.2d 835, 837 (N.D. 1963). The appellant has failed to establish the existence of any of the traditional grounds in Michigan for setting aside such a valid contractual arrangement: mistake, fraud or unconscionable advantage, *Miller, supra,* 280 N.W. at 100.

The evidence showed that the appellant's appraiser took into account most if not all of the damages resulting from the City's improper use of eminent domain, including all construction costs for the new church, the judgment against the appellant by the contractor for breach of contract, the acquisition of the 26 parcels of land and the demolition of the houses thereon, and the higher mortgage rates which the appellant incurred because its credit standing had been harmed by the threat of urban renewal. Although the appraiser arrived at the sum of $1,219,000, he has since admitted to several mistakes, one of which was the including of an amount of $400,000 for work that was not done. When the original estimate is decreased by these amounts, the result is very close to the amount of the settlement, supporting appellee's argument that all of the factors which the appellant contends should have been considered by the Master were in fact included in the settlement figure.

The judgment of the District Court is affirmed.

McCREE, Circuit Judge (dissenting).

If anything is clear from a study of the voluminous record in this case, it is that the Clinton Street Greater Bethlehem Church has been pillaged and despoiled in the past two decades as thoroughly as any ancient city at the onslaught of raiding barbarians. The record reveals exorbitant payments by the Church to various persons for services ostensibly performed in connection

with the securing of mortgages, building permits, construction contracts and the rendering of legal assistance sought in a futile effort to respond to defendants' urban renewal program. Egregious among the expenditures is the payment of $13,120 apparently for only the notarizing of some papers. The Church claims that it did not receive just compensation when its property was taken in 1961, and we should hesitate before appearing to accord judicial sanction to the treatment received by the Church at the hands of the legal establishment—public and private—during the development of this case. In my opinion, the Church has not received the full consideration of its contentions to which it is entitled, and the consideration it has received has been in many respects erroneous.

Although the record is hardly a model of clarity, I believe it indicates sufficiently that the Church is a member of the affected class of property owners, is not foreclosed from presenting its contention by its acceptance of the negotiated amount in 1963, and did not receive in 1963 an amount representing compensation for the fair value of its property as of the dates of the two takings to which it was subjected. Accordingly, I respectfully dissent from the affirmance of the district court.

With respect to the first determination of the majority opinion, that the district court properly "affirmed the Master's findings that the appellant was not a member of the class" and therefore "was not entitled to have his [sic] claim considered by the Master under the 1969 order of this Court," I observe initially that the Master did not find that appellant is not a member of the class; the Master's opinion does not even indicate that he considered the question, although implicit in his determination that the Church had entered into a binding settlement is a recognition of the right of the Church to raise the issue of the adequacy of its award. Further, the Master considered hundreds of claims for additional compensation pursuant to the order of the district court, and there is no indication that he regarded the Church to be in a posture fundamentally different from that of the other claimants even though the Church had been exempted from the initial condemnation. Accordingly, to the extent that the Master made a finding in this respect, it is a finding that the Church is a member of the affected class, a finding that is entitled to great weight. *See* In re Plenz, 111 F.2d 860, 861 (7th Cir. 1940).

More important, the evidence clearly shows that the Church is a member of the class of "those property owners within the 'Mich. 1-11' area who have been subject to the dual condemnation actions here involved." Foster v. City of Detroit, 254 F.Supp. 655, 667 (E.D. Mich.1966), aff'd, 405 F.2d 138, 146 (6th Cir. 1968). The Church, of course, was subject to the second condemnation in 1961 as were the other class members, and its property was within the Mich. 1-11 area. But because it was exempted from the first formal condemnation at its request, and because its income [from contributions?] supposedly rose during the late 1950's, the majority opinion reasons that it was not subject to "dual condemnation." I believe this conclusion is contrary to the undisputed evidence.

As will appear *infra,* it cannot fairly be said on this record that the Church's income increased during the late 1950's. And, even if this were the case, that by itself would not justify a determination that the Church is not in the class. Income in the form of voluntary offerings is not determinative of the value of real property occupied by the recipient church. But the majority opinion, although conceding that a "de facto taking" can occur "in the absence of formal procedures," distinguishes the Church's situation from that of the Fosters on the ground that the exemption of the Church resulted in the filing of no lis pendens against Church property, no hindrance to the Church's obtaining building permits, and no attempt gener-

ally to effect a taking of the Church's property without formally condemning the property, as occurred with respect to the property of the Fosters.

The majority opinion thus does not require the district court to determine whether the actions and policies of the city in the renewal area surrounding the Church "took" the Church's property in the same way that they took, *de facto*, the property of the Fosters and the other property owners. It also does not consider the fact that the city reneged on its promise to allow the Church to remain if it bought up the surrounding property and constructed a new facility. In my opinion, by condemning the Church in 1961, after the Church had spent substantial sums in acquiring the remainder of the property on its block (for which it was forced to pay the sellers' prices) and in constructing the foundation of a new building, the city removed the basis of the bargain it had struck with the Church and should not now be permitted to rely on the exemption of the Church from the initial plan. Cf. Santobello v. New York, 404 U.S. 257, 92 S.Ct. 495, 30 L.Ed.2d 427 (1971). The city's "double-cross" (as appellant's witness agreed was an accurate description) should be viewed as having placed the Church in the same position in which it would have been if no exemption agreement had been reached, and thus, at a minimum, the district court should be required to consider whether the Church was the victim of a *de facto* taking during the 1950's as were the Fosters' other neighbors in the Mich. 1–11 area. Even more appropriate, however, in view of the findings of the district court concerning the actions of the city in the area surrounding the Church, *see* 254 F.Supp. at 662, and the uncontroverted testimony of the negative effect of these actions on Church attendance, *see* Appendix at 107, 125–28, would be a determination by this court that the Church is a member of the affected class because it was subject to a *de facto* taking in the 1950's.

The majority opinion's second ground for decision—that the Church is bound by its acceptance of the sum offered by the city in 1963—is equally untenable. First, it should be pointed out that the majority opinion is not correct in stating that the Church had no objection to being taken in 1961. Walter Wade, the chairman of the Church's board of trustees and director of its business affairs, testified that the Church members "wanted to develop that area and make that area an outstanding monument for our surroundings. We had no intention of surrendering it at all." Appendix at 107. Mr. Wade testified that they "resented" the city's action, Appendix at 86, but that when they received the notice of the city's intention to condemn the Church in 1961, they thought that "we were through down there. The fact is that they would take us, but we would be made whole for what we were worth . . . ." Appendix at 106. According to Mr. Wade, by the time that the Church officials realized that the city would not pay the true value of the Church property, it was too late to resume construction of the new building and to seek a further exemption from condemnation. And, the Church had gone to considerable trouble to obtain mortgages to purchase another building in which to relocate, besides having suffered a decrease in membership as a result of the city's actions in the surrounding area.

For whatever reason, however, the Church did agree to accept a figure of $763,235 in 1963, and the majority opinion agrees with the district court and the Master that this constituted a binding compromise and settlement. If the Church had been the only resident within the plan area that had received a sum in final settlement of the city's obligation and was merely attempting to reopen negotiations on the basis of a subsequent change in the law, then I would accept without question the majority's view. But examination of the record reveals that every landowner in the Mich.

1–11 area who was determined by the Master and district court to be a member of the class represented by the Fosters and therefore entitled to make a claim for additional compensation had previously received payment from the city as compensation for the taking of his property. Indeed, although most of the awards were made in 1962 and 1963, after the city initiated the second condemnation phase in the area on November 11, 1961, *see* Foster v. City of Detroit, *supra,* 254 F.Supp. at 659 n. 10, and after the Fosters had filed suit, *see id.* at 660 n. 12,[1] there were at least five awards to property owners whose land was taken in the 1950's and who received payment at the time of taking, long before the Fosters filed suit.[2] I fail to see the difference between these settlements and the Church's settlement in terms of binding effect. The Master appeared to place weight on whether the claimants had counsel when they settled,[3] but the record reveals no claim on the part of uncounseled property owners that they were the victims of mistake, fraud, or unconscionable conduct, which the majority opinion observes to be the grounds in Michigan for rescinding contracts. If all the other Mich. 1–11 property owners were allowed to reopen their settlements, the Church should not be precluded from doing so.

Finally, the majority opinion appears to affirm the district court's determination that the Church has not proved that it was entitled to any compensation in addition to what it received in 1963, even assuming that the Church, like the other Mich. 1–11 property owners, could benefit from the change in the law effected by the *Foster* case and cases such as Detroit v. Cassese, 376 Mich. 311, 136 N.W.2d 896 (1965). In this appeal, the Church claims that it was not compensated for the following: 1) $190,900.20 for the acquisition and demolition of the 26 parcels on its block that it was forced to acquire in the 1950's as a condition of being exempted from the first condemnation plan; 2) $331,069.06 for the cost of construction of the new Church structures; 3) $66,869.51 for costs incurred in settling the breach of contract suit initiated against the Church by the firms constructing the new church; 4) $118,275 for the costs of obtaining new mortgages after the city condemned the Church in 1961.

The Church contends that at most it was compensated in 1963 for the value of its existing completed facilities—presumably the value as of the time of the *de facto* taking by the city in the 1950's

---

1. There is nothing in the record to indicate that any of these class members expressly reserved the right, pending disposition of the *Foster* case, to seek additional compensation, or that there was any understanding between them and the city that these were merely interim awards.

2. These awards are the following:
   1) The Broadnaxes suffered a taking of parcel No. 873, according to the Master, on January 1, 1956, and they received $1,200 from the city on that date "as a result of condemnation proceedings against said parcel." On August 3, 1970, they were awarded an additional $6,890 by the Master, confirmed by the district court, to compensate them for what the Master found to be the true value of the property on the date on which the city de facto "took" it.
   2) Anthony Didek suffered a taking of parcels 180, 181, according to the Master, on December 1, 1960, and he received $7,900 on that date from the city. On

March 20, 1972, he received from the Master an additional award of $3,650.34.
   3) The Holloways suffered a taking of parcel 360, according to the Master, on December 15, 1958, and they received $3,900 on that date from the city. On March 20, 1972, they received from the Master an additional award of $4,311.66.
   4) The Stegmans suffered a taking of parcel 724, according to the Master, on January 1, 1959, and they received $10,000 on that date from the city. On July 25, 1972, they received from the Master an additional award of $8,731.67.
   5) The Shaws suffered a taking of parcel 286, according to the Master, on August 20, 1955, and they received $6,000 on that date from the city. On August 1, 1972, they received from the Master an additional award of $3,700.

3. *See* Award to the Bookers, parcels 14, 15, 16, on December 19, 1969.

—and that it did not receive payment for the value of the new improvements under construction in reliance on the city's exemption agreement, for the additional property it was forced to acquire as a condition of being exempted, and for damages resulting from the city's "abusive" use of its power of eminent domain. The city does not contend, and neither the district court nor the majority has determined, that these sums are not properly includible in a compensation award. To the contrary, they assert that the 1963 award—specifically, the $300,000 increase negotiated by the parties—reflected the damages that the Church is now attempting to recover. I cannot agree that this conclusion is justified.

First, it should be observed that the Master, who heard the testimony and conducted the lengthy hearings in this case, has never found that the 1963 award included compensation for the costs sought by the Church; the Master pretermitted consideration of this question by holding the Church bound by its settlement agreement, a holding which I have shown to be erroneous in the circumstances of this case. Accordingly, the trier of fact, who has heard hundreds of similar claims in the three years following our affirmance of the district court in 1968, has not been afforded the opportunity to make findings in the first instance about the actual value of the Church's property as of the date of taking.

Second, the majority opinion agrees with the district court's appraisal, based on a 1961 Dun & Bradstreet report, that the Church's income rose during the period 1958–60 and therefore the Church could not have suffered any damage from a de facto taking. However, the report states on its face that part of this rise in income was attributable to room and board collected at the annexed girls' home and dormitory, and the uncontroverted testimony of Mr. Wade was that the rise in general donations was attributable to a building fund drive. Appendix at 167–68. More important,

even if the Church's income did rise, in the face of the loss of membership to which Mr. Wade testified, there is no consideration by the Master, district court, or the majority in this appeal whether the market value of the Church property declined because of the city's actions. The income figure is merely an indicium of the Church's over-all economic health and of the benevolence of its members. It not only may not reflect any of the actual losses suffered by the Church but it also is irrelevant to the Church's contention in this appeal that it was not compensated for the costs specified above (e. g., the cost of the new foundation or of acquiring the rest of the block).

Third, the record, although difficult to follow, appears to support the Church's contention that it was inadequately compensated for the properties considered. The Church's own appraiser testified that he made two appraisals in 1962. The first was an appraisal of the Church property as of January 30, 1962, which came to $1,228,856.11. The second was an appraisal of the property as of 1958, which was a figure of $1,287,876. However, the appraiser admitted that this latter appraisal included the value of the foundation of the new church, which was not completed until 1960, and thus that the appraisal was too high by $421,280.35. The district court and the majority appear to rely on this error to justify a conclusion that the Church property was worth about what was paid for it by the city in 1963, but this ignores the fact that the important figure for our purposes is the 1962 appraisal, which includes the completed foundation of the new church. This appraisal has not been challenged in a significant way by the city and in fact it is consistent with the assessment of the city's director of the municipal housing commission in 1962 that the Church had $1,172,643 in costs and liabilities that could have been "readily substantiated" to a condemnation jury. Defendants' Exhibit 1J. Subtracting the sums sought in this appeal from the 1962 ap-

praisal results in an approximation of the award received by the Church and therefore substantiates the Church's claim in this appeal that it received over $450,000 less than it was entitled to. The 1958 appraisal, less the value of the foundation of the new structure, is consistent with the Church's claim that in 1963 it was entitled to compensation for preexisting property worth over $800,000 in the late 1950's plus a $400,000 improvement and other costs incurred as the result of the second condemnation. The 1958 figure is also consistent with the 1959 report of the Church on file with the Michigan Corporation and Securities Commission, a report on which the district court relied, which shows the value of the Church's assets to be $725,488. Since that figure presumably does not reflect the addition of the foundation of the new church or the other costs incurred in 1961 by the Church, it lends further support to the Church's claim that its property was worth over $1,200,000 by 1961. Finally, if the Church's property was worth about $800,000 in 1958 and, as held by the district court and the majority, was worth about the same in 1961, even after the foundation and other costs were added in then it appears to me that the Church has substantiated its claim that the actions of the city in the 1950's depreciated its property by over $400,000 and therefore resulted in a *de facto* taking of that amount.

I believe that we should remand this case to the district court with directions to resubmit it to the Master for findings concerning the value of the Church's property as of the time of the two takings to which the Church was subjected. Only then will we be able to ascertain whether the Church has sufficiently established its claim. If we are to decide the claim on the basis of the record before us, however, I would hold that the district court's conclusions are not supported by the evidence and that the Church is entitled to the additional compensation it seeks.